*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0038P (6th Cir.)
File Name: 04a0038p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

No. 02-5738

LAWRENCE EDWARD
CRAYTON, JR., also known as
Manny Harris and Alex
Winters,
*Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 98-00091—John G. Heyburn II, Chief District Judge.

Argued: December 9, 2003

Decided and Filed: February 5, 2004

Before: ROGERS and COOK, Circuit Judges; COHN,
District Judge.[*]

---

[*] The Honorable Avern Cohn, United States District Judge for the
Eastern District of Michigan, sitting by designation.

---

## COUNSEL

**ARGUED:** William Yesowitch, BARBER,
BANASZYNSKI & GLIDEWELL, Louisville, Kentucky, for
Appellant. Candace G. Hill, ASSISTANT UNITED STATES
ATTORNEY, Louisville, Kentucky, for Appellee.
**ON BRIEF:** William Yesowitch, BARBER,
BANASZYNSKI & GLIDEWELL, Louisville, Kentucky, for
Appellant. Candace G. Hill, Terry M. Cushing, ASSISTANT
UNITED STATES ATTORNEYS, Louisville, Kentucky, for
Appellee. Lawrence Edward Crayton, Jr., Lompoc,
California, pro se.

---

## OPINION

---

ROGERS, Circuit Judge. Lawrence Crayton, Jr. (a/k/a
Manny Harris, Alex Winters, and Terrell Mason) appeals his
conviction of attempt, conspiracy, and possession of over five
kilograms of cocaine with the intent to distribute. After
receiving a tip from a police department in another state, the
Louisville Metro Police searched boxes from an incoming
cargo plane for a package addressed to "Alex Winters." After
obtaining a warrant, the police opened the box, replaced the
six kilograms of cocaine contained inside with filler, and
delivered the package. Crayton, pretending to be Winters,
signed for the package at the delivery address. Crayton and
his cousin, Andre Alexander, sped away in a vehicle with the
package. Crayton and Alexander were followed by the
police, and at some point during the chase, the box was
opened and tossed out of the vehicle. Both men were
arrested. During a joint trial, Alexander was acquitted, but
the jury could not reach a verdict as to Crayton. A second jury
convicted Crayton of all three charges, and he was sentenced
to three concurrent life terms of imprisonment. Because the

district court did not violate the "rule of consistency" or err in deciding any of the other issues Crayton raises on appeal, we affirm the judgment of the district court.

### FACTS

On April 15, 1998, Los Angeles, California, Police Detective George Osborne, with the Narcotics Interdiction Unit, received a tip that a box shipped via UPS and bound for Louisville was suspicious because the return address was false. Osborne then alerted the Louisville Metro Police Department to the suspicious box.

The Metro Police K-9 unit was waiting at the UPS depot when the suspicious box arrived. The dog alerted on one box shipped from California to Louisville, and the police got a warrant for the package. The brown cardboard box was opened from the bottom so as not to damage the label on the top. Inside, the police found Styrofoam peanuts and two packages wrapped in Christmas paper and cellophane tape. Each package contained approximately three kilograms of cocaine. The police then put a 4.5 gram sample of cocaine into the box along with dummy packages of non-narcotic filler wrapped to resemble the cocaine packages. A tracking device was added, and the box was resealed.

Police set up surveillance around 541 North 44th Street, the destination listed on the label of the box addressed to "Alex Winters." A detective disguised in a UPS uniform delivered the box to the address. The detective got out of the UPS truck and knocked on the door of the house, but no one answered.[1] At this point, Crayton pulled up to the house in a blue

---

[1]Police later discovered that the home was owned by Anthony Anderson, an investor who remodels houses for resale. The house was vacant, and Anderson did not know or give Crayton or any of his aliases permission to use the house.

Suburban and stated that he was Mr. Winters.[2] Crayton signed for the package as Alex Winters. At this time, the detective noticed there was another person in Crayton's vehicle. That person was Andre Alexander, Crayton's cousin.

Crayton and Alexander left in the Suburban, but the police followed the vehicle without lights and sirens. During the pursuit, Crayton and Alexander stopped for five minutes on the shoulder of a road. The officers described that stop by Crayton and Alexander as a countersurveillance move to see if anyone was following them. After several minutes, Crayton asked Alexander to open the box. While opening the box, Alexander found the sample cocaine bag left in the box by the police, and he tossed the box and its contents out of the car window and into an alley. Crayton's vehicle then sped up, the police turned on their lights and sirens, and a chase began. When Crayton drove into a high traffic area, the police stopped the vehicle and arrested Crayton and Alexander.

During the arrest, Crayton identified himself as "Manny Harris," and he claimed to have no idea what was in the box. However, the police found the opened box near an alley along the route Crayton had taken.

Manny Harris was charged with trafficking in cocaine and tampering with physical evidence. Harris posted bond and fled. On July 7, 1998, a federal grand jury issued an indictment against Harris and Alexander. Count 1 of the indictment charged Harris with conspiring with Alexander and unknown persons to possess cocaine with the intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 846. Count 2 charged Harris and Alexander with attempting to possess cocaine with the intent to distribute. Count 3 charged them with actually possessing cocaine with the intent to

---

[2]A "Manny Harris" bought a blue Suburban with cash around this time, although there is some confusion as to the actual date of the purchase.

distribute.  Crayton, then going by the name of Terrell Mason, and Alexander were arrested on January 2, 1999 in Los Angeles.  In September 2000, a superseding indictment was issued in which Crayton was named specifically and the quantity, six kilograms, of cocaine was added to the indictment.

A trial was held in December 2000, and the jury acquitted Alexander but was unable to reach a verdict as to Crayton. Before his second trial, Crayton moved for a bill of particulars, but the district court denied the motion.  Crayton was convicted on all counts in his second trial.  He was sentenced to life in prison.

## ANALYSIS

### I.  Effect of the Prior Acquittal of Alexander

Crayton makes a number of arguments based on the prior acquittal of his co-conspirator Alexander.  None have merit.

#### A.  Powell*'s Effect on the Rule of Consistency*

The district court properly denied Crayton's motion to dismiss the superseding indictment based on the rule of consistency, which would require that one co-conspirator could not be convicted when all other co-conspirators are acquitted at the same trial, because that "rule" is no longer good law.  Before his second trial, Crayton moved to dismiss the superseding indictment because the indictment still contained Alexander's name, even though Alexander had been acquitted as a co-conspirator at the previous trial.  This court reviews *de novo* a district court's denial of a motion to dismiss an indictment on legal grounds.  *United States v. Campbell*, 279 F.3d 392, 398 (6th Cir. 2002); *In re Ford*, 987 F.2d 334, 339 (6th Cir. 1992).

The rule of consistency at one time required "that, where all possible co-conspirators are tried together, and all but one are

acquitted, the remaining conspirator's conviction must be reversed for lack of sufficient evidence."  *United States v. Walker*, 871 F.2d 1298, 1304 n.5 (6th Cir. 1989) (dictum). However, the rule of consistency did not apply when co-conspirators were tried separately and all but one were acquitted.  *United States v. Roark*, 753 F.2d 991, 995-96 (11th Cir. 1985) (cited in *United States v. Sachs*, 801 F.2d 839, 845 (6th Cir. 1986)).  Likewise, if the charges against all but one alleged co-conspirator had been dismissed, the rule of consistency was inapplicable.  *Sachs*, 801 F.2d at 845.

The Supreme Court's decision in *United States v. Powell*, 469 U.S. 57 (1984), rendered the so-called "rule of consistency" no longer good law.  Before *Powell*, this court applied the rule of consistency in *United States v. Williams*, 503 F.2d 50 (6th Cir. 1974).  In *Williams*, a father and his adult son flew into a Cleveland airport, but one of their suitcases was lost.  *Williams*, 503 F.2d at 52.  The airline lost baggage department found the bag and discovered that it contained large amounts of cocaine and heroin.  *Id.*  The airline gave the bag to the Drug Enforcement Administration, who substituted the real narcotics with a non-narcotic substance and gave the bag to the son.  *Id.*  The agents followed the son to the motel room and eventually caught the father, son, and another man, Willie Johnson, attempting to flush the narcotics down the toilet.  *Id.*  All three men were charged with possession and conspiracy, and the jury found the father guilty of possession but could not reach a verdict as to the conspiracy of the father or the other two men.  *Id.*  Prior to the second trial, the possession charges against the son and Johnson were dismissed.  *Id.*  At the second trial, all three men were convicted of conspiracy.  *Id.*

The court held that there was insufficient evidence to sustain Johnson and the son's conspiracy convictions.  *Id.* at 54.  The court then announced the "rule of consistency" by stating "[s]ince we have found that the convictions of Johnson and Williams, Jr. cannot stand, the conviction of Williams, Sr. must also fall.  Where all other alleged co-conspirators are

acquitted, the conviction of one person for conspiracy will not be upheld." *Id.; see also United States v. Sachs*, 801 F.2d 839, 845 (6th Cir. 1986) (stating in dictum, "if coconspirators are tried together, an acquittal on conspiracy charges as to all but one coconspirator mandates acquittal on conspiracy charges as to the remaining defendant").

Since we last applied the rule of consistency in *Williams*, a unanimous Supreme Court has held that inconsistent jury verdicts are permissible. *See Powell*, 469 U.S. at 68-69. The defendant in *Powell* was convicted of using the telephone to commit the felony of "conspiracy to possess with the intent to distribute and possession with intent to distribute cocaine," but she was acquitted of knowingly and intentionally possessing cocaine with the intent to distribute. *Id.* at 60. She argued that the verdicts were inconsistent because she was found guilty of conspiring to do something that she was acquitted of, namely possession with the intent to distribute cocaine. *Id.* The Court reaffirmed the holding of *Dunn v. United States*, 284 U.S. 390, 393 (1932), that "where truly inconsistent verdicts have been reached, '[t]he most that can be said . . . is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt.'" *Id.* at 64-65. The Court rejected the argument that courts must assume that an inconsistent acquittal is necessarily "the one the jury 'really meant.'" *Id.* at 68. "It is equally possible that the jury, convinced of guilt, properly reached its conclusion on the compound offense, and then through mistake, compromise, or lenity, arrived at an inconsistent conclusion on the lesser offense." *Id.* at 65.

The *Powell* Court relied specifically on the rationale that "inconsistencies" often are the product of jury lenity, recognizing "the jury's historic function, in criminal trials, as a check against arbitrary or oppressive exercises of power by the Executive Branch," and, that the Government is unable to invoke review of such lenity. *Id.* at 65-66. The Court rejected as imprudent and unworkable a rule that would

allow criminal defendants to challenge inconsistent verdicts on the ground that in their cases the verdict was a product of some factor other than lenity. *Id.* at 66. Finally, the Court relied on the independent review of the sufficiency of the evidence undertaken by the trial and appellate courts to afford protection against jury irrationality or error. *Id.* at 67.

*Powell* does not discuss inconsistent jury verdicts among co-conspirators, but as a number of our sister circuits have held, *Powell* rendered the rule of consistency no longer good law. Thus, the acquittal of all but one co-conspirator during the same trial does not necessarily indicate that the jury found no agreement to act. *See United States v. Bucuvalas*, 909 F.2d 593, 597 (1st Cir. 1990); *United States v. Thomas*, 900 F.2d 37, 40 (4th Cir. 1990); *United States v. Zuniga-Salinas*, 952 F.2d 876, 877-79 (5th Cir. 1992) (en banc); *United States v. Valles-Valencia*, 823 F.2d 381, 381-82 (9th Cir. 1987); *United States v. Andrews*, 850 F.2d 1557, 1560-62 (11th Cir. 1988) (en banc). Other circuits have recognized that the rule of consistency does not survive *Powell*, without actually so holding. *United States v. Dakins*, 872 F.2d 1061, 1065 (D.C. Cir. 1989) (*Powell* "cast[s] doubt" upon rule of consistency); *United States v. Mancari*, 875 F.2d 103, 104 (7th Cir. 1989) (rejection of rule of consistency "makes good sense in light of *Powell*"); *Gov't of the Virgin Islands v. Hoheb*, 777 F.2d 138, 142 n.6 (3d Cir. 1985) (rule of consistency "may be a vestige of the past"). *See also* Chad W. Coulter, Comment, *The Unnecessary Rule of Consistency in Conspiracy Trials*, 135 U. PA. L. REV. 223 (1986).

The only contrary circuit opinion appears to be that of the Tenth Circuit. In *United States v. Suntar Roofing, Inc.*, 897 F.2d 469 (10th Cir. 1990), that court, while affirming convictions based on the existence of unindicted co-conspirators, suggested that the rule of consistency may have continuing vitality. The court noted that the trial court's conclusion that the rule of consistency was no longer good law "is substantially undercut by the fact that the *Powell* opinion does not discuss *Hartzel* [*v. United States*, 322 U.S.

680 (1944)] or expressly overturn the traditionally recognized exception." *Suntar Roofing*, 897 F.2d at 475. As the First Circuit has reasoned, however, the Tenth Circuit's concern is not well founded:

> [T]he *Hartzel* decision to which the Tenth Circuit referred did not involve inconsistent jury verdicts. Instead, the "only co-conspirators of petitioner named in the indictment" had their convictions set aside by judges due to insufficient evidence. 322 U.S. at 682 n. 3 . . . . It has been, and remains, the law that where the evidence against all of an individual's alleged co-conspirators is deemed legally insufficient, the evidence against that individual is by definition also insufficient. *See, e.g., Morrison v. California*, 291 U.S. 82, 93 [] (1934); *Gebardi v. United States*, 287 U.S. 112, 116, 123 [] (1932); *United States v. Velasquez*, 885 F.2d 1076, 1090-1091 and n. 13 (3d Cir. 1989) (expressly noting it was not applying the rule of consistency, court held that an earlier appellate finding of insufficient evidence to convict the only alleged co-conspirator required finding insufficient evidence as to the remaining defendant.); *United States v. Levario*, 877 F.2d 1483, 1486 (10th Cir. 1989) (trial court's granting motion for judgment of acquittal as to only alleged co-conspirator precluded conspiracy conviction); *United States v. Hernandez-Palacios*, 838 F.2d 1346, 1348-49 (5th Cir. 1988) (same). A court's determination that there is insufficient evidence to convict cannot be equated with a jury's determination that a defendant, for whatever reason, should be acquitted. Accordingly, rather than there being any "conflict between *Powell* and *Hartzel*," *Suntar Roofing*, 897 F.2d at 475-476, the Court's emphasis in *Powell* on the sufficiency of the evidence fully embraces the *Hartzel* ruling. *See Andrews*, 850 F.2d at 1562 n. 15.

*Bucuvalas*, 909 F.2d at 596-97.

The reasoning of *Powell* applies to co-conspirator cases even though *Powell* itself did not involve co-conspirators. As the First Circuit reasoned, "an apparent failure to prove an essential element of the offense would not distinguish conspiracy from any other case involving an inconsistent verdict." *Id.* at 597. In a co-conspirator case just as much as in *Powell*, inconsistencies may be the product of jury lenity, given the jury's historic function as a check on arbitrary exercises of power. In a co-conspirator case just as much as in *Powell*, a rule that depended upon whether jury lenity was actually a factor would be "imprudent and unworkable." And finally, in a co-conspirator case just as in *Powell*, the independent review of the sufficiency of the evidence undertaken by the trial and appellate courts affords protection against jury irrationality or error. It is thus clear that the "rule of consistency" previously recognized in this circuit did not survive *Powell*.

## B. Unknown Conspirators

Even if the rule of consistency survived *Powell*, reversal would not be required in the present case. We have held that "an individual's conviction for conspiracy may stand, despite acquittal of other alleged coconspirators, when the indictment refers to unknown or unnamed conspirators and there is sufficient evidence to show the existence of a conspiracy between the convicted defendant and these other conspirators." *United States v. Anderson*, 76 F.3d 685, 688-89 (6th Cir. 1996). Like the indictment in *Anderson*, Count 1 of Crayton's superseding indictment specifically mentions Alexander and "other persons, known and unknown." The record presents ample evidence for a reasonable jury to have concluded that Crayton conspired with unknown people in California who sent the package to Crayton, or unknown people in Louisville, to facilitate the delivery and/or distribution of the cocaine. Thus, Crayton's conviction in the second trial would not violate the rule of consistency even if it were still good law.

### C. Constructive Amendment of Counts 2 and 3

Contrary to Crayton's contentions, the Government moreover did not constructively amend the superseding indictment during the trial by not removing Alexander's name and the aiding and abetting language from Counts 2 and 3 of the superseding indictment. *See e.g., United States v. Chilingirian*, 280 F.3d 704, 712 (6th Cir. 2002). Count 2 of the superseding indictment states ". . . Crayton . . . and . . . Alexander, each aided and abetted by the other, did attempt to knowingly and intentionally possess with intent to distribute . . . cocaine . . . ." Count 3 is identical except "attempt to" is omitted. The case law of this circuit disposes of this claim. In *Anderson*, in language almost identical to that of Count 2 in this case, the indictment stated that the defendant aided and abetted two individuals who were acquitted at the same trial. *Anderson*, 76 F.3d at 689. In that case we held,

> The indictment gave defendant notice that he was being charged under count two both with being an aider and abettor and with the substantive crime of attempt. Indeed, the punctuation of the indictment sets off the "aided and abetted" phrase from the crime of attempt to possess cocaine with intent to distribute. The jury was entitled to find defendant guilty of the substantive crime of attempt even though his codefendants were found not guilty of attempt or aiding or abetting his attempt.

*Id.* For identical reasons, there was no constructive amendment of Crayton's superseding indictment.

### D. Alexander's name in the Jury Instructions

Finally, the district court did not somehow create a mandatory presumption that Alexander was a co-conspirator by including Alexander's name in the jury instructions. Alexander's name was only mentioned in the jury instructions when Count 1 of the superseding indictment was read. The district court never mentioned any type of presumption, and

it clearly mentioned that the burden of proof was on the Government when the court stated "[t]he indictment . . . against the defendant is not evidence of guilt. The defendant is presumed innocent by the law, and the presumption of innocence is always there. . . . The defendant need not prove anything. . . . The United States has the burden of proving the defendant guilty beyond a reasonable doubt . . . ." J.A. at 778-79. The district court therefore did not err by reading Alexander's name in the indictment with the jury instructions.

## II. The Effect of Beamus's Testimony

Crayton makes two arguments based on the fact that during Crayton's second trial, the Government called Terri Beamus as a rebuttal witness. Beamus testified as to some individuals who may have aided Crayton with possible drug activity in Louisville. Beamus had not been called to testify in the first trial against Crayton and Alexander. The rebuttal testimony of Beamus does not require a reversal of Crayton's conviction because no bill of particulars was required, there was no unfair surprise in her testimony, and there was no violation of *Brady v. Maryland,* 373 U.S. 83 (1963).

### A. Bill of Particulars

First, the district court did not abuse its discretion in denying Crayton's Motion for a Bill of Particulars because it is unlikely that Crayton would have gleaned anything from a bill of particulars. This court reviews the district court's denial of Crayton's motion for a bill of particulars for an abuse of discretion. *United States v. Perkins*, 994 F.2d 1184, 1190 (6th Cir. 1993). To make a successful challenge to a district court's denial of a motion for a bill of particulars, "the defendant must show not only that the court abused its discretion, but that defendant actually suffered surprise or other prejudice at trial." *United States v. Salisbury*, 983 F.2d 1369, 1375 (6th Cir. 1993).

Between the first and second trials, Crayton moved for a bill of particulars to find out more about the conspiracy charge since Alexander had been acquitted. The district court denied this motion shortly before trial. Crayton argues that the district court erred by denying his motion for a bill of particulars and that he suffered prejudice because, he alleges, the Government unexpectedly changed the theory of its case in rebuttal by placing into evidence, during rebuttal, names of potential co-conspirators without any corroborative evidence.

Crayton claims that the second trial was virtually identical to the first trial until Beamus's testimony, but that her testimony was an unfair surprise. The function of a bill of particulars is to "to minimize surprise and assist [the] defendant in obtaining the information needed to prepare a defense and to preclude a second prosecution for the same crimes." *Id.* A bill of particulars "is not meant as a tool for the defense to obtain detailed disclosure of all evidence held by the government before trial." *Id.*

The Government was not aware of Beamus's testimony until the day before her rebuttal, and it is thus unlikely that a bill of particulars given before trial would have provided Crayton with helpful information. Further, the Government is not required to furnish the name of all other co-conspirators in a bill of particulars. *United States v. Rey*, 923 F.2d 1217, 1222 (6th Cir. 1991). Therefore, even if the Government had known of Beamus's testimony at the beginning of trial, the identities of the possible co-conspirators she named would not need to be revealed in a bill of particulars. Crayton knew that unnamed persons were referred to in the conspiracy count of the indictment. Although Beamus's testimony may have been unexpected, it was not an unfair surprise that the grant of a bill of particulars would have avoided, and the district court did not abuse its discretion in this regard.

**B. Alleged** Brady *Violation*

The Government also did not illegally withhold exculpatory evidence from Crayton. The Sixth Circuit reviews *de novo* a district court determination that the prosecution did not wrongfully withhold exculpatory evidence. *United States v. Tarwater*, 308 F.3d 494, 515 (6th Cir. 2002). Where, as in this case, the defense counsel did not make a motion for a mistrial or raise the question of a possible *Brady* violation to the district court, we review at most for plain error. *See United States v. Delgado*, 350 F.3d 520, 527 n.10 (6th Cir. 2003).[3] As we explain, the district court did not err, much less commit plain error.

Crayton contends that the prosecution did not provide him with a prior statement by Beamus, in which she corroborated Crayton's story, until shortly before she testified. During her testimony, Beamus apparently changed her story and no longer corroborated Crayton's version of events. Thus, since the Government did not give the defense Beamus's prior inconsistent statement until shortly before her testimony, Crayton's due process rights are said to have been violated under *Brady v. Maryland*, 373 U.S. 83 (1963).

Beamus's prior statement was not explicitly exculpatory in that it did not tend to negate directly the guilt of the defendant. Instead, Beamus's statement was nonexculpatory evidence that could be used to impeach her testimony. "Impeachment evidence, however, as well as exculpatory evidence, falls within the *Brady* rule." *United States v. Bagley*, 473 U.S. 667, 676 (1985).

---

[3] It could also be said that defendant waived his *Brady* claim, such that even plain error review is not required. *See United States v. Scarborough*, 43 F.3d 1021, 1025 (6th Cir. 1994); *see also United States v. Reeves*, No. 99-1248, 2000 WL 687649, at **2 (6th Cir. May 19, 2000) (applying this concept to a *Brady* claim).

However, Crayton suffered no prejudice because the Government did produce the impeachment material in a manner consistent with the requirements of *Brady*. Where a defendant claims a violation of *Brady* because of the Government's failure to produce impeachment evidence, "so long as the defendant is given impeachment material, even exculpatory impeachment material, in time for use at trial, we fail to see how the Constitution is violated." *United States v. Presser*, 844 F.2d 1275, 1283 (6th Cir. 1988).

The record indicates that Beamus's one-page prior inconsistent statement was turned over to the defense soon after the Government decided to call Beamus as a witness and before she testified. Any disadvantage that a defendant might suffer because of the tardiness of impeachment material can be cured by asking for a recess. *Id.* at 1283-84. Crayton's counsel only asked for a moment to look over Beamus's prior statement, and the district court granted this request. Further, Crayton's counsel questioned Beamus extensively about the prior inconsistent statement, during cross examination. Thus, there appears to have been no *Brady* violation. Moreover, even if there had been a *Brady* violation, "the proper inquiry is whether the *Brady* violation undermines confidence in the verdict, because there is a reasonable probability that there would have been a different result had the evidence been disclosed." *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998). It is difficult to imagine that the jury would have reached a different result if the defense had Beamus's prior statement before trial. There was therefore clearly no violation of Crayton's constitutional rights under *Brady*.

### III. Alleged Sentencing Errors

*A.* Apprendi

The district court did not violate *Apprendi v. New Jersey*, 530 U.S. 466 (2000), by sentencing Crayton without a jury finding as to the exact quantity of cocaine he possessed. *Apprendi* held that any fact, other than a prior conviction,

"that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490. Crayton was sentenced to life imprisonment for each count, which is within the statutory maximum for possession of over five kilograms of cocaine. *See* 21 U.S.C. § 841 (b)(1)(A). Crayton argues that the district court erred by sentencing him to the statutory maximum for possessing over five kilograms of cocaine without a specific jury finding as to the quantity he possessed.[4]

The district court complied with the requirements of *Apprendi* because the district court instructed the jury that, for Crayton to be convicted, the Government needed to prove beyond a reasonable doubt that Crayton "conspired or agreed to commit the crime of possession with the intent to distribute *over five kilograms of cocaine.*" J.A. at 780 (emphasis added). The district court likewise indicated the same quantity instruction along with counts two and three. Crayton's sentencing, therefore, does not violate *Apprendi* because the jury found Crayton guilty of conspiracy, attempt, and possession of "over five kilograms." Thus, the jury sufficiently determined the quantity of cocaine that Crayton possessed and it was that quantity that the district court used to sentence Crayton to the statutory maximum for that amount of cocaine.

---

[4]That the defendant makes this argument is rather ironic considering that it was the Government that raised the possible *Apprendi* issue immediately after the jury instructions were read to the jury. However, Crayton's counsel effectively objected to any change to the instructions to take *Apprendi* into account. (More precisely, Crayton's counsel objected to changing a proposed verdict form to comply with *Apprendi*, and at the same time stated that "the verdict form is consistent with the instruction.") Thus, since Crayton intentionally relinquished or abandoned his known right, the issue could also be deemed waived. *See United States v. Olano*, 507 U.S. 725, 733 (1993); *United States v. Sheppard*, 149 F.3d 458, 461 (6th Cir. 1998).

### B.   Sentencing Under United States Sentencing Guideline § 3D1.1

Crayton also contends that the district court erred by sentencing him to imprisonment for three concurrent life terms because the district court failed to consider United States Sentencing Guideline ("U.S.S.G.") § 3D1.1.[5] According to Crayton's argument, § 3D1.1 requires the district court to group the three counts and only sentence him to one life term instead of three.

The defendant misreads U.S.S.G. § 3D1.1—which actually directs the court to determine the combined offense level.[6] The Presentence Report clearly indicated a proper application of §3D1.1.  The Presentence Report grouped all three counts

---

[5]Section 3D1.1 states:

a) When a defendant has been convicted of more than one count, the court shall:

   (1) Group the counts resulting in conviction into distinct Groups of Closely Related Counts ("Groups") by applying the rules specified in § 3D1.2.

   (2) Determine the offense level applicable to each Group by applying the rules specified in § 3D1.3.

   (3) Determine the combined offense level applicable to all Groups taken together by applying the rules specified in § 3D1.4.

(b) Exclude from the application of §§ 3D1.2-3D1.5 any count for which the statute (1) specifies a term of imprisonment to be imposed; and (2) requires that such term of imprisonment be imposed to run consecutively to any other term of imprisonment. Sentences for such counts are governed by the provisions of § 5G1.2(a).

[6]Note that the title of § 3D1.1 is the "Procedure for *Determining Offense Level* on Multiple Counts" (emphasis added).

---

together and used § 2D1.1(c)(4) to determine the base offense level.  J.A. at 830.

It is § 5G1.2 that actually governs sentencing on multiple counts.  Section 5G1.2(b) provides generally that "the total punishment is to be imposed on each count and the sentences on all counts are to be imposed to run concurrently to the extent allowed by the statutory maximum sentence of imprisonment for each count of conviction."  U.S.S.G. § 5G1.2, cmt. n.1.  This is precisely what the district court did, and the district court thus did not err in  calculating Crayton's sentence.

### C.  Sentencing Under 21 U.S.C. § 851

Crayton's sentencing using 21 U.S.C. § 851 was moreover free of constitutional defect.  Crayton claims that § 851, which deals with enhanced penalties for prior convictions, was used punitively in his case and represents an improper delegation to the executive of legislative power to set criminal penalties.  Crayton argues that § 851 violates separation of powers because the decision to request an enhanced sentence lies with the United States Attorney, while the district court has no leeway.[7]  As the Eleventh Circuit has held, § 851 is not an improper delegation of legislative authority.  *See United States v. Cespedes*, 151 F.3d 1329, 1331-35 (11th Cir. 1998) ("[R]ather than delegating legislative power, § 851 affords prosecutors a power no greater than that traditionally exercised by the executive branch in the charging decision.").  Crayton suggests the lack of case law on the issue since

---

[7]Crayton in a *pro se* supplemental brief also argues that his two prior California state drug conviction should not have been used to enhance his sentence under 21 U.S.C. § 851.  However, during oral argument, Crayton's counsel properly conceded that the defendant misapplied case law in this regard.

*Apprendi* may indicate that the courts are currently viewing the issue differently.[8]

Section 851 provides that increases in sentences based upon prior felony drug convictions may not be imposed unless the United States Attorney has filed an information stating the previous convictions to be relied upon. 21 U.S.C. § 851(a). A defendant may challenge the use of any of the prior convictions that occurred within the previous five years.[9] 21 U.S.C. § 851(b)-(c) & (e). At sentencing, the court *must* then impose the enhanced sentence if the defendant does not file a response to the information "or if the court determines, after hearing, that the person is subject to increased punishment by reason of prior convictions." 21 U.S.C. at § 851(d)(1).

Crayton complains that this mandatory obligation of the district court to impose the enhanced sentence that the prosecutor decides to put in the information places the prosecutor in the position to set criminal penalties—a function of the legislature. Thus, Crayton argues that § 851 improperly delegates legislative power to the executive.

---

[8] We fail to see how the Supreme Court's decision in *Apprendi*, relied upon by Crayton in this context, would affect the constitutionality of § 851. *Apprendi* specifically states that a jury need not decide prior convictions for a defendant to receive an enhanced sentence. *Apprendi*, 530 U.S. at 490 ("*Other than the fact of a prior conviction*, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (emphasis added)). Therefore, the fact that there may be a lack of case law on the possible separation of powers issue in § 851 after *Apprendi* was decided is not troublesome.

[9] The five year collateral attack limitation period contained within 21 U.S.C. § 851 does not violate due process. *See United States v. Reed,* 141 F.3d 644, 652-53 (6th Cir. 1998); *United States v. Gonzales*, 79 F.3d 413, 427 (5th Cir. 1996); *United States v. Arango-Montoya*, 61 F.3d 1331, 1338 (7th Cir. 1995); *United States v. Williams,* 954 F.2d 668, 673 (11th Cir. 1992).

The Supreme Court, in rejecting an argument that prosecutorial discretion under § 851 led to unwarranted disparity in sentencing, has analogized prosecutorial discretion under § 851 to the power of the executive to charge defendants. In *United States v. LaBonte*, 520 U.S. 751 (1997), the Supreme Court stated:

> Insofar as prosecutors, as a practical matter, may be able to determine whether a particular defendant will be subject to the enhanced statutory maximum, any such discretion would be similar to the discretion a prosecutor exercises when he decides what, if any, charges to bring against a criminal suspect. Such discretion is an integral feature of the criminal justice system, and is appropriate, so long as it is not based upon improper factors.

*LaBonte*, 520 U.S. at 762 (citations omitted).

The Fourth Circuit recently considered the issue of § 851 as an improper delegation of legislative authority. *See United States v. Moody*, 30 Fed. Appx. 58, 60-61, No. 01-4285, 2002 WL 235595 (4th Cir. Feb. 19, 2002) (per curiam). Relying on the language of *LaBonte*, quoted above, the Fourth Circuit held that there is not an improper delegation of legislative power to the executive because the prosecutor is simply acting within his prosecutorial discretion.

The rationale of *LaBonte* leads directly to the conclusion that § 851 does not violate the principle of separation of powers. The discretion a prosecutor exercises in determining whether an enhanced statutory maximum applies under § 851 is similar to the initial discretion the prosecutor has in deciding which charges to bring against a defendant, discretion that is obviously constitutional. Therefore, Crayton's claim in this regard must fail.

## IV.  Other Issues Raised by Crayton

We also find no merit in the remaining issues raised by Crayton.

### A.  Prosecutorial Misconduct

The statements made by the prosecutor during his direct examination of Beamus did not amount to prosecutorial misconduct. Specifically, Beamus testified that she picked up several people including Crayton at the airport and took them to her house because her cousin wanted to talk with Crayton. Crayton contends that the prosecutor then improperly asked Beamus if her cousin had "been involved with the distribution of cocaine?", to which Beamus replied, "Yes, sir, I think so." J.A. at 703. At this point, the defense objected, and Beamus's answer was stricken.

In order for a prosecutorial misconduct claim to succeed, statements by the prosecutor must first be deemed to have been improper. *Tarwater*, 308 F.3d at 511. If the statements were improper, the court then "look[s] to see if they were flagrant and warrant reversal." *Id.* To determine flagrancy, the court considers

> 1) whether the statements tended to mislead the jury or prejudice the defendant; 2) whether the statements were isolated or among a series of improper statements; 3) whether the statements were deliberately or accidentally before the jury; and 4) the total strength of the evidence against the accused.

*Id.* The government's theory of the case was that Crayton came to Louisville to distribute cocaine and not just to visit Louisville for the Kentucky Derby festivities. Thus, the question the prosecutor asked was relevant to the theory of the case and not flagrantly improper.

"To warrant a new trial, however, prosecutorial misconduct must be so pronounced and persistent that it permeates the entire atmosphere of the trial." *United States v. Krebs,* 788 F.2d 1166, 1177 (6th Cir. 1986) (internal quotes omitted). Crayton's counsel properly objected to the answer, and his objection was sustained. The statement was removed from the record. This one question, made at the end of the trial and removed from the record, hardly permeated the entire trial. It is the only incident Crayton points to of the prosecution's intentionally misleading the jury. Since the defendant has not shown that the prosecution's question was improper, much less that it rose to the level of flagrant misconduct, prosecutorial misconduct does not warrant reversal in this case.

### B.  Sufficiency of the Evidence

Finally, there was sufficient evidence for a reasonable jury to convict Crayton of conspiracy. In his supplemental *pro se* brief, Crayton argues that there was insufficient evidence to convict him of conspiracy with the intent to distribute. "[W]hen the sufficiency of the evidence is challenged on appeal, the standard of review is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Swidan*, 888 F.2d 1076, 1080 (6th Cir. 1989) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original)).

Crayton argues that the government failed to prove that he conspired with anyone to possess with intent to distribute cocaine. We have summarized what evidence is needed to establish a conspiracy under 21 U.S.C. § 846—the same section Crayton was charged under—by stating:

> To establish a drug conspiracy under 21 U.S.C. § 846, the government must prove "'that a conspiracy existed, that the accused knew of the conspiracy, and that he

knowingly and voluntarily joined it.'" *United States v. Barrett*, 933 F.2d 355, 359 (6th Cir. 1991) (quoting *United States v. Christian*, 786 F.2d 203, 211 (6th Cir. 1986)).   The essence of conspiracy, of course, is agreement, but proof of a formal agreement is not necessary; "a tacit or material understanding among the parties" will suffice. *United States v. Pearce*, 912 F.2d 159, 161 (6th Cir. 1990). . . . "'A conspiracy may be inferred from circumstantial evidence that can reasonably be interpreted as participation in the common plan.'" *United States v. Blakeney*, 942 F.2d 1001, 1010 (6th Cir. 1991) (quoting *United States v. Bavers*, 787 F.2d 1022, 1026 (6th Cir. 1985)) . . . . The government need not show that a defendant participated in all aspects of the conspiracy; it need only prove that the defendant was a party to the general conspiratorial agreement.  Further, the connection between the defendant and the conspiracy need only be slight. *Id.*

*Untied States v. Ledezma*, 26 F.3d 636, 640 (6th Cir. 1994). The essential elements of conspiracy that violate 21 U.S.C. § 846 are "an agreement between two or more individuals, with the intent to commit an offense in violation of the Controlled Substance Act." *United States. v. Sullivan*, 903 F.2d 1093, 1098 (7th Cir. 1990).  Circumstantial evidence may be the "sole support" of a conviction under § 846. *Id.*

The jury heard testimony from various police officers detailing (1) a tip from the Los Angeles Police Detective, (2) a description of the box addressed to Alex Winters, which had several earmarks of a package containing narcotics, including a phony return address and being sent overnight mail from a source city, (3) the K-9 unit's indication that the box contained narcotics, (4) the officers' removal of the cocaine and resealing the package, (5) Crayton's pretending to be "Alex Winters" to pick up the box at a vacant address at the exact time of delivery, (6) Crayton's driving away and then stopping the car for five minutes on the side of the highway, in what the police described as a

countersurveillance technique to see if the car was being followed, (7) the box being thrown out the window when it was opened, and (8) an ensuing chase.  These facts alone could lead a reasonable jury to conclude that Crayton conspired with the person who sent the package.  In addition, Beamus's testimony may have indicated that her cousins were also involved in cocaine distribution.  Thus, the jury could have concluded that the cousins were also co-conspirators. In sum, a rational trier of fact could easily conclude that Crayton conspired with the intent to distribute cocaine.

### CONCLUSION

Finding no merit to Crayton's claims, we AFFIRM the judgment of the district court.