NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 09a0745n.06

No. 07-4240

**FILED**
**Nov 20, 2009**
LEONARD GREEN, Clerk

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

JOSEPH P. PLATT,

      Petitioner-Appellant,

        v.

MICHAEL SHEETS, Warden

      Respondent-Appellee.

On Appeal from the United States District Court for the Southern District of Ohio at Columbus

_____/

**Before:**     **MARTIN, GUY, and McKEAGUE, Circuit Judges.**

    **RALPH B. GUY, JR., Circuit Judge.**     Petitioner Joseph Platt, a state prisoner, appeals from the dismissal of the petition for writ of habeas corpus he filed pursuant to 28 U.S.C. § 2254. Platt was convicted in Ohio of involuntary manslaughter, felonious assault, and kidnaping, and was sentenced to a total of 15 years in prison. A certificate of appealability was granted with respect to the single claim that there was insufficient evidence to sustain petitioner's conviction for involuntary manslaughter. We find that the state court's determination did not involve an unreasonable application of clearly established federal law or an unreasonable determination of the facts, and affirm.

**I.**

    In May 2002, petitioner was indicted on charges of involuntary manslaughter (Counts

1 and 2), felonious assault (Count 3), and kidnaping (Count 4), each of which included a firearm specification. *See* OHIO REV. CODE §§ 2903.04, 2903.11, and 2905.01. The charges arose out of events that culminated in the shooting death of Daniel Cole, petitioner's lover, on or about April 30, 1997. The state's theory was that petitioner paid two other individuals, Aaron Swank and Michael Gordon, to "teach Cole a lesson" for having stolen from Platt. Swank and Gordon were tried and convicted before petitioner was indicted, but neither testified at petitioner's trial. The jury convicted petitioner on all counts, but acquitted him of the firearm specifications.[1]

The two counts of involuntary manslaughter were merged and defendant was sentenced to nine years in prison for that conviction, to be followed by two concurrent six-year terms for the felonious assault and kidnaping convictions. The Ohio Court of Appeals affirmed Platt's convictions in a written decision issued in February 2005, and the Ohio Supreme Court denied leave to appeal in July 2005.

On July 12, 2006, petitioner filed what the district court found to be a timely application for habeas relief. The first of petitioner's four claims asserted that:

> There was insufficient evidence to prove Petitioner was guilty of [in]voluntary manslaughter, felon[i]ous assault or kidnapping. There was no evidence to prove that Petitioner aided or abetted in the death of the victim, nor was there sufficient evidence to show that he shared the same intent as the killers as it related to felon[i]ous assault and kidnapping.

However, the district court, adopting the magistrate judge's report and recommendation,

---

[1]Contrary to the suggestion made at oral argument, acquittal on the firearm specifications does not invalidate petitioner's convictions on the other counts. *See United States v. Powell*, 469 U.S. 57, 64-67 (1984); *United States v. Crayton*, 357 F.3d 560, 565 (6th Cir. 2004).

concluded that petitioner had procedurally defaulted claims challenging the sufficiency of

the evidence to support the felonious assault and kidnaping convictions by failing to present

them in the application for leave to appeal to the Ohio Supreme Court.  The district court

rejected petitioner's challenge to the sufficiency of the evidence to support the involuntary

manslaughter conviction on the merits.  This is the only claim properly before us.[2]

## II.

A district court's decision granting or denying habeas relief is reviewed *de novo*,

including any factual findings made without conducting an evidentiary hearing.  *Burton v.

Renico*, 391 F.3d 764, 770 (6th Cir. 2004).  Under the Antiterrorism and Effective Death

Penalty Act of 1996 (AEDPA), which governs this case, the factual findings made by the

state court are presumed correct in the absence of clear and convincing evidence to the

contrary.  28 U.S.C. § 2254(e)(1).  For any claim that was adjudicated on the merits in state

court, a writ of habeas corpus may not be granted unless the adjudication resulted in a

decision that "was contrary to, or involved an unreasonable application of, clearly established

Federal law," or "was based on an unreasonable determination of the facts in light of the

evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1) and (2).

In an appeal from the denial of habeas relief on a sufficiency of the evidence claim,

we are bound by two layers of deference:  first, to the jury's verdict as contemplated by

---

[2]The habeas petition also asserted claims related to the admission of evidence at trial, the jury instructions concerning the law of complicity, and petitioner's attempt to subpoena two witnesses.  The district court granted a certificate of appealability only as to the claim that there was insufficient evidence to sustain the conviction for involuntary manslaughter, and this court denied petitioner's motion to expand the certificate of appealability to include the challenge to the jury instructions.

*Jackson v. Virginia*, 443 U.S. 307 (1979); and, second, to the state court's consideration of the jury's verdict as dictated by AEDPA. *Parker v. Renico*, 506 F.3d 444, 448 (6th Cir. 2007). As with any sufficiency of the evidence claim, we must determine whether, viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009). In doing so, we may not reweigh the evidence, reevaluate the credibility of witnesses, or substitute our judgment for that of the jury. *Id*. Then, "[e]ven were we to conclude that a rational trier of fact could *not* have found [the defendant] guilty beyond a reasonable doubt, on habeas review, we must still defer to the *state appellate court's* sufficiency determination as long as it is not [objectively] unreasonable." *Id*.

At the time of petitioner's convictions, Ohio Rev. Code § 2903.04 defined involuntary manslaughter to include causing the death of another "as a proximate result of the offender's committing or attempting to commit a felony." Petitioner was found guilty of two underlying felonies; namely, complicity by aiding and abetting the felonious assault and kidnaping of Daniel Cole. To support a conviction for complicity by aiding and abetting, the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in committing the offense, and that the defendant shared in the criminal intent of the principal. *State v. Johnson*, 93 Ohio St.3d 240, 245-46 (2001). The defendant's intent may be inferred from the surrounding circumstances. *Id*. For purposes of determining culpability for involuntary manslaughter, "proximate result" is akin to "proximate cause" "'in that defendant will be held responsible for those foreseeable consequences which are known

to be, or should be known to be, within the scope of the risk created by his conduct.'" *State v. Platt*, No. 03ap-1148, 2005 WL 407574 at *7 (Ohio Ct. App. Feb. 22, 2005) (unpublished) (quoting *State v. Losey*, 491 N.E.2d 379, 382 (1985)).

The Ohio Court of Appeals summarized the evidence as follows:

According to the state's evidence, defendant and Daniel Cole had a relationship and Cole periodically stayed at defendant's house. At some point in their relationship, Cole began to steal items from defendant, which Cole apparently later sold.

Around March 1997, defendant and another person, "Tony," charged into Cole's sister's house with guns drawn, looking for Cole. Defendant sought Cole because Cole, along with another person, "Richard," had stolen items from him. Defendant and "Tony" chased Cole and "Richard" upstairs. Noises were later heard from upstairs. Thereafter, Cole appeared with a bloodied nose and Cole and "Richard" left with defendant and "Tony." Upon leaving the house, defendant told Cole "that if he ever stole off of him again he would shoot him in the back of the head after they beat him up and throw him in the trash bag and throw him in the trash where he belonged." When Cole returned to his sister's house later that same evening, he had a black eye and a bloodied lip. His nose was also still bloodied.

In early 1997, defendant, who at that time was a "[t]all, bigger guy" with "curly hair, some facial hair, beard, glasses," on several occasions also solicited others to physically attack Cole, defendant's then boyfriend, in retaliation for Cole's thievery against defendant; in exchange, defendant offered $500 as consideration. Ultimately, Aaron Swank and Michael Gordon accepted defendant's offer.

Thereafter, in the early morning of April 30, 1997, after Cole and a friend had been partying at [the Friendly Tavern], Cole entered a car in front of the tavern with a man named "Joe," who was later identified as defendant. When Cole entered the car, defendant appeared angry. Cole told his friend [Richard Stolzenburg] with whom he had been partying not to worry and that he would meet the friend in an hour at a designated location. Cole's friend waited, but Cole never arrived at the arranged location.

Around that same time, during the late evening of April 29, 1997, or the early morning of April 30, 1997, Aaron Swank, Michael Gordon,

Stephanie Coleman, Keaton Payne, and Dawn Barrowman were at Swank's house on Heyl Avenue in Columbus, Ohio. At the time, Coleman and Barrowman were partying; this partying included alcohol and drug use. While Coleman and Barrowman were at Swank's house, a "heavy-set white guy" came to the front door. The "heavy-set white guy" entered the house, met with Swank and possibly with Gordon and Payne. Later, "the heavy-set white guy," Swank, Gordon, and Payne left the house. A few minutes later, the "heavy-set white guy," along with Swank, Gordon, and Payne forcibly ushered a "skinny white male" into Swank's house and took this male into the basement. According to Coleman, at the time that the "skinny white male" was forced into Swank's house, Swank held a gun to "the skinny white male's" head and pulled "the skinny white male's" shirt over his head to conceal his identity. According to this witness, at the time "the skinny white male" was forced into the house, his eyes were as big as 50-cent pieces." Sporadic screams later were heard from the basement for several hours.

According to Barrowman, at one point, "the heavy-set white guy" came upstairs, retrieved something, and returned to the basement. Later, Payne came upstairs and left the house, appearing scared or frightened. The "heavy-set white guy" also came upstairs and left the house. Following the departure of Payne and the "heavy-set white guy," sporadic screams continued to be heard from the basement.

At some point, Gordon came upstairs and asked Coleman to clean up blood in the basement. Coleman refused. Gordon them asked Barrowman to clean up the blood in the basement. Barrowman also refused. Gordon then returned to the basement.

Eventually, Gordon and Swank came upstairs, and later Gordon, Swank, Coleman, and Barrowman drifted off to sleep.

On the afternoon of April 30, 1997, refuse was collected in Swank's neighborhood. While the operator of the refuse truck emptied his load at a refuse transfer station, an employee of the refuse transfer station discovered Cole's body among trash that was being unloaded. An autopsy revealed that Cole had sustained a fatal gunshot wound to the head and blunt trauma to his face, trunk, and extremities.

*Platt*, 2005 WL 407574, at *1-2. With this in mind, we turn to petitioner's specific arguments.

Identifying discrepancies in the evidence and challenging the credibility of some of the witnesses, petitioner emphasizes a discrepancy in the evidence regarding when Cole left the bar and was forced into Swank's house. Specifically, Cole's friend testified that Cole left voluntarily with a guy named "Joe" at 2:15 or 2:30 a.m., while the two women, Barrowman and Coleman, testified that the "skinny white guy" was forcibly escorted at gunpoint into Swank's house between 11:00 p.m. and midnight, or 11:30 p.m. and 12:30 a.m., respectively. If Cole did not leave the bar until 2:00 a.m., petitioner reasons, he and Cole could not have been at Swank's house two or three hours earlier.

Similarly, petitioner argues that the evidence was insufficient to establish that Cole was severely beaten in the basement, or elsewhere, because no traces of blood were found in the basement despite the testimony of Barrow and Coleman that they heard periodic screams and Gordon asked them to clean up blood in the basement. Both women refused, and neither went down to the basement. Also, a deputy coroner testified that Cole died from a gunshot wound to the head, but all but one of the abrasions and blunt traumas to Cole's body could have been caused after the shooting when the body was dumped into the garbage truck.

Petitioner identifies inconsistencies in the details concerning petitioner's solicitation of others to "teach Cole a lesson," and emphasizes that the witnesses said petitioner "only" wanted someone to break Cole's legs. Chasity Wiseman testified that she was present when Swank and Gordon accepted petitioner's offer of $500 to break Cole's legs to teach him a lesson for stealing from petitioner. Wiseman said this offer was made at a residence on Ann

Street in the presence of petitioner, Gordon, Swank, McCaine, and Stierhoff. Stierhoff testified concerning two conversations in which he heard petitioner soliciting others to "teach Cole a lesson," but neither conversation took place at the Ann Street residence. Nonetheless, Stierhoff's testimony corroborated Wiseman's, as he related a later conversation between petitioner and Swank:

> Joe is mad, he hasn't got his gun back, he's not got his money back. He wants, you know, what's going — how're we going to do this, what's going to happen, whatever. That's when I just told him I didn't want nothing to do with it. I don't want to even hear about it. Backed out of the room. That was it. The doors went closed. I don't know what happened in there.

Finally, in a classic challenge to credibility, petitioner argues that Krista Stumbaugh's testimony should not be believed. Stumbaugh, who was the mother of Cole's child, testified that she was living at Cole's sister's house and was there when petitioner and "Tony" chased Cole and gave him a bloody nose. Petitioner told Cole that he would beat him, shoot him in the back of the head, and leave his body in the garbage if Cole stole from him again. Petitioner argues that Stumbaugh did not know the name of the street where she had been living or the names of all the people who were also living there, and that none of the other people supposedly present, including Cole's sister and mother, corroborated her testimony. Lastly, petitioner contends that her testimony "simply proves too much."

The Ohio Court of Appeals addressed these arguments—albeit in part in addressing the sufficiency of the evidence to support the underlying convictions—rejected the claim that witnesses for the prosecution were biased, and emphasized that the jury is to determine the witnesses' credibility and the weight their testimony should be given. The Ohio Court of

Appeals also found, in pertinent part, as follows:

> Here, although there was conflicting evidence about details concerning defendant's solicitations in response to Cole's thievery as well as conflicting evidence about details of the events at Aaron Swank's house, based upon the totality of the evidence, we find a jury reasonably could infer that defendant was the "heavy-set white guy" who came to Aaron Swank's house on or around April 30, 1997. Moreover, viewing the evidence in its totality, we find a jury reasonably could infer that Cole was the "skinny white male" that was forced into Swank's house at gunpoint and that defendant was complicit in inflicting serious physical harm to him.
>
> . . . [and] that defendant was complicit in knowingly causing physical harm to Cole that carried a substantial risk of death.

*Platt*, 2005 WL 407574. at *4-5. The court also found that, viewing the evidence as a totality, "a jury reasonably could conclude beyond a reasonable doubt that defendant was complicit in forcing Cole from the place where he was found for the purpose of facilitating the commission of a felony, terrorizing Cole, or inflicting serious physical harm to Cole." *Id*. at *6.

Having concluded that the convictions for complicity by aiding and abetting felonious assault and kidnapping were supported by legally sufficient evidence, the Ohio Court of Appeals framed the remaining question as "whether Cole's death reasonably could be anticipated by an ordinarily prudent person as likely to result based upon the facts and circumstances." *Id*. at *7. Turning to the evidence, the court found that: "Because a deadly weapon was used to forcibly usher Cole into Swank's basement, . . . a jury reasonably could conclude that Cole's death was a foreseeable consequence of defendant's complicity in Cole's kidnapping at gunpoint." *Id*. The court added that a jury also could reasonably infer that the screams from the basement were Cole's, as was the blood Gordon asked the two

women to clean up. Ultimately, the court found that: "Viewing the evidence in its totality, a jury could conclude beyond a reasonable doubt that defendant was complicit in setting forth a chain of events for which Cole's death was a foreseeable consequence, which was known to be, or should have been known to be, within the scope of the risk created by defendant's conduct." *Id*.

Petitioner does not dispute the Ohio court's statements of the law, or claim that the state court's adjudication is "contrary to" established federal law. Nor are we persuaded by petitioner's passing argument that the state court's failure to specifically discuss the discrepancies in the physical evidence represents an unreasonable determination as to the facts. Keeping in mind the two levels of deference applicable to a habeas sufficiency of the evidence claim, we find that the evidence taken as a whole and viewed in the light most favorable to the prosecution is constitutionally sufficient to support petitioner's conviction for involuntary manslaughter. Moreover, even if that were not the case, we further conclude that it was not objectively unreasonable for the state court to determine that the evidence was sufficient to support petitioner's conviction for involuntary manslaughter.

**AFFIRMED**.