NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 07a0503n.06
Filed: July 18, 2007

No. 05-2740

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| *Plaintiff-Appellee,* | ) | On Appeal from the United States |
| | ) | District Court for theWestern |
| v. | ) | District of Michigan |
| | ) | |
| MATTHEW SEAN SPRY | ) | |
| *Defendant-Appellant.* | ) | |

Before: ROGERS, Circuit Judge; COOK, Circuit Judge; and O'MALLEY, District Judge.[*]

*O'MALLEY, J.* Defendant-Appellant Matthew Sean Spry ("Spry") was convicted by a jury on two separate counts of Aggravated Sexual Abuse of two Native American Indian females, both of whom were under the age of twelve at the time the sexual acts were performed. On appeal, Spry contends the district court erred in denying his request for a mistrial based upon the delayed disclosure of *Brady* material. For the reasons set forth below, we **AFFIRM** the order of the district court.

## I.    BACKGROUND

### A.    Factual Background

In or around December 2003, the mother of "KM" and "NM" reported to the Hannahville

_____

[*]    The Honorable Kathleen O'Malley, United States District Judge for the Northern District of Ohio, sitting by designation.

Tribal Police Department that KM and NM had been sexually assaulted by Spry, the girls' half-brother, many years earlier. KM, NM and Spry all share the same mother. The girls are Native American Indians; Spry is not. Disclosure of the assaults occurred when (a then-teenage) NM expressed concerns to her mother about her half-brother during a time period when Spry and his mother were involved in a dispute over Spry's visitation time with his seven-year-old daughter.[1]

An investigation was conducted by the Undersheriff for the Hannahville Tribal Police Department, Thomas Hayward ("Undersheriff Hayward"), and an FBI Special Agent, Jay D. Johnston ("Agent Johnston").[2] The investigators came to the girls' home the day the assaults were reported, on December 3, 2003, but were unable to interview the girls during this initial contact because of their emotional state. The girls were asked to prepare written statements for use in a subsequent interview. Their statements were given to the investigators the next day, on December 4, 2003, when the girls participated in an interview at their home.

Spry was contacted by the investigators on December 4, 2003, shortly after the girls were interviewed. The investigators informally questioned Spry in the privacy of the investigators' vehicle. During this contact, Spry first denied the allegations, but then admitted to some of the acts. Spry stated that he engaged in several incidents with the girls when he was as young as thirteen years old.

Spry was formally interviewed on February 5, 2004, at the FBI offices in Marquette, Michigan. During this interview, after being confronted with the victims' statements, Spry began

---

[1] Spry's mother had custody of Spry's daughter after Spry and his ex-girlfriend (the mother of the child) ended their relationship.

[2] The FBI was brought in as a result of the determination that the assaults occurred on Indian land, against Native American Indians, in violation of federal law.

2

to cry and proclaimed, "All right, I'm guilty . . . I did it." A grand jury indictment eventually charged Spry with two counts of aggravated sexual abuse: Count One pertained to KM; Count Two pertained to NM.

According to Count One of the indictment, repeated assaults against KM began when she was six or seven years old, while Spry was living with KM's family in the Hannahville Indian Tribal Community. The specific incidents that formed the basis of Count One of the indictment allegedly occurred in 1998. The assaults against NM allegedly likewise began when she was six or seven years old, and while Spry was still living with her family on Indian land. The specific incidents that formed the basis of Count Two of the indictment allegedly occurred in 1995. A jury trial began on September 20, 2005. KM and NM testified on the first day of trial.

KM initially testified on direct examination that she was in the seventh grade when the assaults referenced in Count One of the indictment occurred. Her teacher at the time was "Gina Senone." She recalled one incident occurring in the springtime, when she was riding with her half-brother in a "big, black car" he owned. After further questioning by the government, however, KM admitted a mistake. She recalled that the particular incident in question happened when she was in the fourth grade; not the seventh grade. Her explanation for the confusion between the two time periods was the fact that she had the same teacher, Ms. Senone, in both the fourth and seventh grades. She further testified that the time frame must have been when she was in the fourth grade because she recalled that Spry's girlfriend was pregnant at the time, and that the baby was born in 1998.

On cross-examination, KM again insisted the assault in the black car occurred when she was in the fourth grade. Spry's counsel attempted to attack her credibility by questioning her about a

statement she initially made to Agent Johnston indicating that the incident in the black car occurred when she was in the seventh grade. KM was unable to recall what she told Agent Johnston. Spry's counsel, nevertheless, was able to get KM to concede she was "probably" about eight or nine years old in the fourth grade - which Spry's counsel pointed out would mean the incident in the black car must have taken place in 1995 or 1996 (based upon KM's current age), to which KM agreed. This was in contrast to the date listed in Count One of the indictment, which identified the year KM was assaulted as 1998.

On re-direct, KM confirmed that Spry's daughter was born in 1998. Then, by subtracting the year Spry's daughter was born (1998) from the year KM was born (1987), KM was able to testify that she was actually eleven years old at the time the incident in the black car occurred. KM again insisted she was in the fourth grade at that time. She further confirmed that Ms. Senone was her teacher in the fourth grade, and also in the seventh grade.

On the next (second) day of trial, immediately upon taking the witness stand for cross-examination, the former Undersheriff of the Hannahville Tribal Police - Undersheriff Hayward - testified that he had in his possession a report of his interview notes from the December 4, 2003 discussions with KM, NM and Spry. The Undersheriff produced the report to Spry's counsel, who reviewed it in open court and requested a recess. An on-the-record discussion was held between Spry's counsel, the government's attorney, and the trial judge. Spry's counsel advised the court that, of the approximately ten-page report, he had only received three pages in response to a prior Jencks request.[3]

---

[3] According to the trial transcript, at the final pretrial, the district court ordered that both the Hannahville and the Sioux Tribes disclose their records in this matter before trial commenced. Numerous telephone discussions between Spry's attorney and the government's

Spry's counsel maintained that the missing pages indicated KM gave a different time frame in her interview for the assaults charged than appeared in Count One of the indictment.[4] Although the missing pages were produced to Spry's counsel prior to the cross-examination of the report's author, Spry's counsel claimed a "severe" violation of the government's obligations under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194,10 L.Ed.2d 215 (1963) because the interviewee (KM) had already testified. Defense counsel argued the report contained "evidence favorable to the defense" because it would have further assisted him in his line of questioning with respect to the date on which the assaults took place:

> Had I been armed with this information in this report, I would have been better able to cross-examine [KM]. It's very critical, as she's making the change from fourth to seventh grade on when these allegations supposedly took place. It's critical because she says it took place - - the incident with my client took place in my client's black car. I asked a lot of questions about that, and I tried to pin her down specifically when this happened. There is a reason for that. My client didn't get the black car until 1998. She wasn't in fourth grade in 1998. And so these are critical areas. Had I been armed with this report, I would have had the ability to cross-examine her about what she told [the Undersheriff] and what she told [the FBI Special Agent] about whether it was fourth grade, whether it was seventh grade.

attorney resulted in an agreement that the government's attorney would send Agent Johnston to the tribal police departments to obtain their records. The government's attorney then faxed what Agent Johnston received to Spry's counsel. Also during this time, Spry's counsel, the government's counsel, and Agent Johnston collectively called the Hannahville Tribal Police and requested a facsimile transmission of the entire report prepared by that department regarding Spry. Apparently, the middle pages of the report contained Undersheriff Hayward's interview notes, but those pages were not included in the facsimile transmission sent to the government's attorney on the day Spry's counsel was in her office. The government's counsel claimed at trial to have first discovered there were additional pages to the report during the testimony of the former Undersheriff.

[4] The report itself has not been included in the appellate record; therefore, the only clue as to the content of the missing pages comes from the remarks of Spry's counsel made during his transcribed discussion with the district court judge.

> Also in this report, which is not in [the FBI Special Agent's] report, is the fact that she says [Spry's] girlfriend was pregnant when she was in the fourth grade.

> \* \* \*

> This is material - - it's favorable to the defense. Because if I can show that this could not have taken place on the year she says it did, because he didn't have the car until after that, it goes right to the heart of her credibility.

JA 226-227. Based on this argument, defense counsel asked for a mistrial.

The district court responded to these arguments by agreeing with the government that, where the cross-examination of the report's author had not yet begun, there was no requirement under the Jencks Act, 18 U.S.C. § 3500, that the report be available prior to cross-examination of the author. The court did, however, believe there likely was a *Brady* requirement for earlier disclosure. The court said it would take the matter under advisement, but noted:

> It seems to me, however, that you have this material now. And you can certainly utilize it, especially if you get these young ladies back. If it's exculpatory material for your client - - and you claim that it is, and I don't have any reason to disagree with that - - you can get that - - well, first of all, you can get what they said through [the Undersheriff] if he's the one who wrote the report and heard it. You can get it through [the FBI Special Agent] if he made the report and heard it. I don't even know who made the report. That's Number 1.

> And then I don't see that you're particularly prejudiced by anything, even though it's a delay that I don't like.

JA 229-230. The court then instructed the government to make KM and NM available for further testimony.

After the recess, Spry's counsel began his cross-examination of Undersheriff Hayward. The former Undersheriff denied discussing KM's allegations against Spry with her, and agreed that any

testimony by KM indicating she <u>had</u> discussed her allegations directly with the Undersheriff would not be truthful. Agent Johnston was also cross-examined and testified that, when he interviewed KM, she was unable to provide a specific year for the allegations in her written statement. KM did mention to Agent Johnston, however, that because the incident in Spry's black car occurred when she was in Ms. Senone's class, she thought the incident had happened when she was in the seventh grade.

Agent Johnston confirmed that KM's then-present recollection was that the assault occurred when she was in the seventh grade and that her recollection was based solely upon the teacher she had when the assault occurred. Spry's counsel then elicited from Agent Johnston that Spry did not obtain the black car until 1998, and that he no longer had it in 2001 - which is the year KM was actually in the seventh grade. Agent Johnston further testified that KM was re-interviewed by another agent following this discovery, and that her later statement was that she was in the fourth grade, not the seventh grade, when the incident in the black car occurred.

At the conclusion of testimony that day, the government assured the court that KM and NM were available to be recalled to the stand and that they would continue to stay in town for that purpose.

### B.     Procedural Background

At the beginning of the third day of trial, the district court denied the defendant's oral motion for a mistrial. Among other authorities, the court cited *United States v. Crayton*, 357 F.3d 560, 569 (6th Cir. 2004), stating that *Crayton* held that: "tardy disclosure of *Brady* material does not constitute a *Brady* violation, and will not result in sanctions, unless the defendant can show that the delay has denied him a fair trial." JA 242. The court noted that the burden of showing prejudice is high, and

7

found that no such prejudice occurred here. The court reasoned that Spry's counsel had adequate time to review the statements contained in the report prior to examining the report's author, and that the interviewee (KM) was available to be called back for further cross-examination. *Id.*

While the court specifically provided Spry's counsel with the opportunity to recall both KM and NM, Spry's counsel did not do so. A unanimous jury found Spry guilty on both Counts of the indictment. Spry was subsequently sentenced to a total term of 135 months imprisonment on each of Counts One and Two (to run concurrently), with supervised release for a term of three years thereafter on each count (also to run concurrently). This appeal followed, strictly addressing the district court's unfavorable resolution of Spry's *Brady* challenge.

## II.     DISCUSSION

### A.     Standard of Review

Where, as here, a defendant raises a *Brady* claim in the district court through a motion for a mistrial, we review *de novo* the district court's resolution of the *Brady* challenge. *Crayton*, 357 F.3d at 568-69; *see also United States v. Delgado*, 350 F.3d 520, 527 n.10 (6th Cir. 2003) (noting that a *Brady* challenge is reviewed *de novo* if the challenge is raised in the lower court, but that the "plain error" standard is applied if not previously raised).

### B.     The *Brady* Doctrine

Under *Brady*, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. The Supreme Court has included impeachment material as within the scope of "evidence favorable to an accused" for purposes of *Brady* disclosures. *United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 87

8

L.Ed.2d 481 (1985). *Brady*, therefore, applies to prior statements that, although not explicitly exculpatory in that the prior statements do not tend to negate directly the guilt of the defendant, are non-exculpatory evidence that can be used to impeach a government witness. *Crayton*, 357 F.3d at 569.

Generally speaking, *Brady* does not apply to delayed disclosure, but only to a complete failure to disclose. *See United States v. Davis*, 306 F.3d 398, 421 (6th Cir. 2002). "If previously undisclosed evidence is disclosed, as here, during trial, no *Brady* violation occurs unless the defendant has been prejudiced by the delay in disclosure." *United States v. Word*, 806 F.2d 658, 665 (6th Cir. 1986). This Court has articulated the rule regarding delayed *Brady* disclosure as follows:

> Where a defendant claims a violation of *Brady* because of the government's failure to produce impeachment evidence, "so long as the defendant is given impeachment material, even exculpatory impeachment material, ***in time for use at trial***, we fail to see how the Constitution is violated."

*Crayton*, 357 F.3d at 569 (emphasis added) (quoting *United States v. Presser*, 844 F.2d 1275, 1283 (6th Cir. 1988)).

Thus, it is clear that, where material arguably exempted from any pre-trial disclosure by the Jencks Act is also arguably *Brady* material, *Brady* is not violated if the material is disclosed in time for its effective use at trial. *Presser*, 844 F.2d at 1283 (citing *United States v. Higgs*, 713 F.2d 39, 44 (3d Cir. 1983) (stating that no due process violation occurs if *Brady* material is disclosed in time for its "effective use at trial"); *United States v. Starusko*, 729 F.2d 256 (3d Cir. 1984) (same)). Spry acknowledges this case law, as he must, but argues that an item of evidence is only produced "in time for effective use at trial" if it is produced in time for the best or most effective use at trial. Thus, because the material was not produced in time for the initial cross-examination of KM, Spry

9

argues its later production could not offset the damage done or cure the *Brady* violation.

We have analyzed this question by examining the materiality of the delayed disclosure, noting that "the question of whether a delay causes prejudice is really just a type of inquiry into materiality." *Joseph v. Coyle*, 469 F.3d 441, 472 n.21 (6th Cir. 2006) (citing *Norris v. Schotten*, 146 F.3d 314, 334 (6th Cir. 1998)). The Supreme Court has explained that the "touchstone of materiality is a 'reasonable probability' of a different result . . ." *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Evidence that is favorable to the defendant is, accordingly, considered material *only if* "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682; *Strickler v. Green*, 527 U.S. 263, 280, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); *Farrell v. United States*, 162 Fed.Appx. 419, 424 (6th Cir. 2006). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682.

To demonstrate the type of materiality, and, thus, prejudice necessary to establish a *Brady* violation based upon delayed disclosure, a defendant must show what he would have done differently had he been given more time to address the *Brady* evidence, and specifically how, had the evidence been given to the defendant earlier, a reasonable probability exists that the result of the defendant's trial would have been different. *See Farrell*, 162 Fed.Appx. at 424; *Delgado*, 350 F.3d at 528; *United States v. Blackwell*, 459 F.3d 739, 759 (6th Cir. 2006).[5] A defendant need not go so far as

---

[5]      In *Coyle,* we further recognized that:

> Some circuits have phrased the delayed-disclosure test in terms of the defendant's ability to prepare for trial. **This court has not, however, endorsed such a formulation**. Rather, we have expressly recognized the Supreme Court's explicit rejection of the

to demonstrate by a preponderance of the evidence that "disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal," but must show that the *Brady* evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 434-35; *United States v. Stamper*, 91 Fed.Appx. 445, 451-52 (6th Cir. 2004).

### C.     Analysis of Spry's Claims

The district court proceeded on the assumption that the missing pages of Undersheriff Hayward's report contained exculpatory material. Absent access to those pages, we have no basis to disturb the trial court's finding on this point. We proceed on the assumption, accordingly, that the government did not timely produce *Brady* material and that the question before us is whether that delay was prejudicial to Spry - i.e., whether the delayed production of Undersheriff Hayward's full report likely had a material effect on the outcome of Spry's trial.

As noted, without showing how he was prejudiced by the delayed disclosure, Spry asserts he was denied the opportunity to "make effective use of the Brady material at trial" because he was "not able to use the 10 page report to cross-examine" the interviewee, KM, whose statements were recorded in the report. We are not persuaded by Spry's broad, and erroneous, concept of material prejudice.

The record discloses that <u>both</u> the government and Spry's defense counsel explored the very

---

> argument that "the [materiality] standard should focus on the impact of the undisclosed evidence on the defendant's ability to prepare for trial."

469 F.3d at 473 n.23 (internal citations omitted) (emphasis added); *see also Bencs,* 28 F.3d at 560 (materiality for purposes of a *Brady* violation does not pertain "to the defendant's ability to prepare for trial.").

credibility issue Spry claims he was unable to adequately develop as a result of the delayed disclosure of Undersheriff Hayward's notes. KM testified on direct examination that she was in the seventh grade when the incident in the black car occurred, but then changed her testimony to indicate she was in the fourth grade. This issue was then explored on cross-examination, when Spry's counsel questioned KM about an initial statement she made to investigators indicating that the incident happened when she was in the seventh grade. Defense counsel, therefore, was aware of the very discrepancy disclosed in the missing pages of Undersheriff Hayward's report *before* those pages were produced at trial. Indeed, prior to his initial cross-examination of KM, Spry's counsel was aware of several facts relevant to this issue: (1) the indictment alleged the assaults against KM occurred in 1998; (2) KM had testified on direct examination that the incident in the black car occurred while Mr. Spry's girlfriend was pregnant, and Spry's daughter was not born until 1998; (3) Spry did not have a black car until 1998; and, (4) KM would not have been in the seventh grade in 1998 (based upon her age at trial).

Thus, even without the missing pages of Undersheriff Hayward's report, Spry's counsel had all the tools he needed to cross-examine KM's discrepancies and to raise questions about whether this was the result of confusion, or a lack of credibility. Spry's counsel also cross-examined Agent Johnston regarding the inconsistencies in KM's statement, and Agent Johnston confirmed that KM initially believed the incident in Spry's black car occurred when she was in the seventh grade because she remembered the teacher she had at the time of the incident, but later claimed it occurred in the fourth grade after she was told Spry no longer owned the black car when KM was in the seventh grade.

The fact that Undersheriff Hayward's notes revealed that KM had waffled before on whether

12

she was in the fourth or seventh grade during the attacks referenced in Count One of the indictment would have added little to Spry's trial strategy; KM waffled between these two time frames on the stand, and Agent Johnston confirmed she had done so in the past as well. The jury had ample reason to question the credibility of (and weigh) KM's recollections. The fact that Spry's counsel believes the Undersheriff's report would have allowed him to "better cross-examine" KM on this issue, or to "better" undercut her credibility on it, does not change the fact that the issue already was well-developed when the late *Brady* disclosure occurred. It is clear, accordingly, that any additional cross-examination of KM on this issue, or impeachment of her based on her inconsistent recollections, would have been cumulative.

Indeed, it is apparent Spry's own counsel did not believe a cross-examination of KM regarding the content of the newly-discovered pages of the Undersheriff's report was material to Spry's defense. The district court specifically granted Spry the opportunity to re-call KM at trial, yet Spry declined to do so. "There is [moreover] no suggestion that this decision was the result of insufficient time to prepare," as Spry's defense counsel never requested a continuance. *See Coyle,* 469 F.3d at 472; *see also United States v. Holloway*, 740 F.2d 1373, 1381 (6th Cir. 1984) ("[C]ounsel for [the defendant] made no request for . . . a continuance. In such a circumstance, we conclude that the timing of the disclosure did not prejudice [the defendant]."); *United States v. Osorio*, 929 F.2d 753, 758 (1st Cir. 1991) ("Generally, we have viewed the failure to ask for a continuance as an indication that defense counsel was himself satisfied he had sufficient opportunity to use the evidence advantageously."). It appears, rather, that a tactical decision was made by Spry's counsel to rest on his cross-examinations of Undersheriff Hayward and Agent Johnson, and on KM's own admission of confusion regarding the time frames during which she asserts the events at issue

13

occurred.

We have repeatedly held that, where a trial court, as here, implements measures to remedy a delayed *Brady* disclosure, but the defendant refuses to take advantage of those remedies, the defendant cannot reasonably claim prejudice as a result of that choice. *See, e.g., Coyle*, 469 F.3d at 472; *Davis,* 306 F.3d at 421 (finding no prejudice from a belated *Brady* disclosure where the "[d]efendant was given every opportunity to review the [newly disclosed] tapes and to recall [the witness] if necessary, but he refused to do so."); *Blackwell*, 459 F.3d at 759 (holding that, where defendant was granted an opportunity to re-cross examine a witness after defendant received *Brady* documents reflecting an immunity agreement during trial, but after the testimony of the witness, "any prejudice resulting from Defendant's failure to [re-cross examine the witness] is not attributable to the government's violation of the principles set forth in Brady."); *Bencs,* 28 F.3d at 561 (stating that, whether analyzed as violating either the Jencks Act or *Brady*, defendant's claim failed where witness statements were disclosed, only timing of disclosure was at issue, and defendant claimed - without explanation or example - that his cross-examination of the witnesses was not as effective as it might have been). That is precisely the circumstance presented here. The district court carefully analyzed the delayed disclosure and offered Spry's counsel an additional opportunity to cross-examine both KM and NM. No more was necessary in the circumstances presented here.

For all of these reasons, Spry has failed to establish that he was prejudiced by the delayed disclosure of Undersheriff Hayward's notes. Spry has not shown there is a reasonable probability that, had the material been disclosed earlier, there would have been a different result at trial. He has made no showing that undermines our confidence in the verdict.

**III.    <u>CONCLUSION</u>**

Because the district court properly denied Spry's oral motion for a mistrial, we **AFFIRM**

Spry's subsequent convictions.