NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0508n.06

**No. 19-6074**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE WESTERN |
| | ) | DISTRICT OF KENTUCKY |
| ERIC TODD, | ) | |
| | ) | |
| Defendant-Appellant. | ) | **OPINION** |
| | ) | |

**FILED**
Aug 28, 2020
DEBORAH S. HUNT, Clerk

Before: MOORE, CLAY, and McKEAGUE, Circuit Judges.

**CLAY, Circuit Judge.** Defendant Eric Todd appeals his conviction and sentence for

conspiring to possess with intent to distribute 50 grams or more of methamphetamine in violation

of 21 U.S.C. §§ 841(a) and 846, raising three claims for relief. Todd first argues that the

government suppressed favorable surveillance video evidence from a White Castle restaurant

where one of the drug sales allegedly involving Todd occurred, in violation of *Brady v. Maryland*,

373 U.S. 83 (1963). Todd next contends that the district court abused its discretion by permitting

the prosecution to question a witness at trial regarding Todd's prior incarceration and unrelated

use of a firearm, in violation of Federal Rule of Evidence 404(b). Last, Todd argues that his

sentence violates his Fourteenth Amendment right to equal protection because his criminal history

score reflected two possession of marijuana convictions that allegedly would not have occurred

but for Todd's African American race. For the reasons that follow, we affirm.

**BACKGROUND**

**A. Todd's *Brady* Claim**

In May 2019, a jury convicted Todd of conspiring to sell 50 grams or more of methamphetamine as part of a large drug trafficking organization ("DTO") responsible for trafficking drugs between Detroit, Michigan and Louisville, Kentucky. The prosecution's theory at trial was that Todd sold drugs to a confidential informant, R.L., on two separate occasions as part of the DTO. Trial testimony established that, in the first controlled sale on April 20, 2016, R.L. purchased approximately one ounce (23 grams) of methamphetamine from Todd. In the second controlled sale on May 20, 2016, R.L. purchased approximately a half pound (223.1 grams) of methamphetamine from Todd in a White Castle parking lot in Louisville.

**1. The White Castle Video**

Prior to trial, Todd requested that the prosecution disclose any surveillance video footage from the White Castle where the May 20, 2016 sale occurred. However, the prosecution failed to disclose the video evidence in its initial discovery and upon later requests. A few weeks prior to trial, Todd's counsel filed a motion *in limine* seeking to prevent the prosecution from entering any evidence that it had failed to disclose. By the time of the parties' final pretrial conference on May 15, 2019, the prosecution still had not disclosed the White Castle video. The prosecution finally disclosed the White Castle video to defense counsel on the evening of Friday, May 24, 2019, just a few days before Todd's trial began on Tuesday, May 28, 2019. Trial testimony established that the prosecution had possessed the video for at least two years prior to trial. Defense counsel stated that he "spen[t] a considerable amount of time reviewing [the video] over the weekend"

immediately prior to trial and that it cut into his "normal trial preparation." (Trial Tr., R. 100, Pg. ID 804.)

Unbeknownst to defense counsel prior to its disclosure, the video does not show Todd present at the May 20 sale. In fact, Todd is not seen at any point in the approximately seven hours of video footage. Instead, the video appears to show another person, who Todd says is government witness Antonio Jackson, carrying out the sale. In the video, Jackson parks a car in the White Castle parking lot and then walks into the White Castle. He can be seen talking on the phone with someone as he enters the White Castle. Still on the phone, Jackson sits at a table and looks out of the window in the direction of the car he parked. In another portion of the video, the government's confidential informant, R.L., is seen talking on the phone in the parking lot and walking towards the car that Jackson parked. Jackson then pops the trunk of the car and R.L. places the money in the trunk of the car and retrieves the methamphetamine. Another government witness and member of the DTO, Velise McAtee, is then seen interacting with Jackson following the drug sale.

## 2. The Trial Evidence

The prosecution's key witnesses at trial were ATF Special Agent Chase Anastasio, confidential informant R.L., and other members of the DTO including Kenneth Westbay, Antonio Jackson, and Velise McAtee.

Jackson and McAtee testified on day two of Todd's trial as members of the larger DTO. Jackson testified that his uncle is one of the major players in the DTO, and that "basically the whole situation" regarding the May 20 deal "was told by my uncle." (Trial Tr., R. 99, Pg. ID 610 (Jackson Test.).) He said that he was the "chosen one" of the DTO, that the other members trusted him with everything, and that he "knew everything" because "[he] was the one right there." (*Id.* at

607, 614–15.) He testified that he did not know Defendant Eric Todd. He claimed that he did not know who put the drugs in the car or took the drugs out of the car during the May 20 sale, and said that he was simply following orders from his uncle.

Government witness Velise McAtee also admitted to her role in the DTO and the May 20 sale in particular. She said that she often rented cars for one of the lead members of the DTO and for Antonio Jackson, and that she would use those cars to transport drugs. She admitted that she rented the car involved in the May 20 transaction and that she gave the car to Jackson in order to facilitate the drug sale. McAtee also testified that she did not know Todd.

Despite having received the White Castle video a few days prior to trial, defense counsel did not use the video in his cross examinations of Jackson and McAtee, even though they are the people supposedly shown in the video. Instead, Todd's cross examinations of both Jackson and McAtee were extremely brief. In his cross examination of McAtee, defense counsel asked a total of five questions which reaffirmed that McAtee did not know Todd, she had never spoken to him, and she had not seen him at the May 20 sale. Todd's cross examination of Jackson was the same— it reaffirmed that Jackson did not know Todd, and had never spoken to him or seen him until the day of trial.

Government witnesses Agent Anastasio and confidential informant R.L. testified on the third day of trial. Their testimony, taken together, was the heart of the prosecution's case.

Anastasio testified that he was investigating Kenneth Westbay as part of the broader DTO investigation. On April 20, 2016, Westbay contacted R.L. (not knowing that she was a confidential informant) and requested a ride to a drug sale that Westbay had set up. R.L. gave Westbay a ride to the drug sale, where, upon arriving, they got into a car with an "unidentified black male," whom

4

R.L. later identified as Todd. Todd sold approximately one ounce of methamphetamine to Westbay, which the DEA's lab report later concluded was around ninety-nine percent pure.

There was no physical evidence linking Todd to the April 20 sale, but R.L. testified at trial that Todd was the person who sold Westbay the drugs in that transaction. She identified him in the courtroom as the person involved, and she identified his voice on the audio recording from the transaction. Westbay also identified Todd as the person from whom he purchased an ounce of methamphetamine on April 20, 2016.

R.L. testified that following the April 20 deal, she passed by Todd again one day on the street. She spoke with Todd, and he gave her a phone number. Using that phone number, law enforcement set up another controlled buy with Todd in which R.L. arranged to purchase one-and-a-half pounds of methamphetamine for $4,500. At trial, R.L. identified Todd's voice on the phone calls setting up the May 20 deal. She testified that, on the day of the sale, she exchanged a series of text messages with Todd in which he directed her to several different locations before meeting to purchase the drugs. Agent Anastasio testified that this was likely a method of ensuring that R.L. was not being followed.

R.L. finally ended up in a White Castle parking lot. She testified that she was on the phone with Todd when she arrived. She said to Todd, "I see you," referring to the car that she thought he would be in. (Trial Tr., R. 100, Pg. ID 679 (R.L. Test.).) However, she said that she was "not positive" that Todd was actually in the car. (*Id.*) R.L. then testified that Todd told her to put the money in the trunk of a car that was in the parking lot. She walked over to the car, and someone popped the trunk open. She put the money in the trunk of the car and removed the methamphetamine. There was no further circumstantial or direct evidence linking Todd to the

White Castle sale—only R.L.'s identification of his voice and the phone number of the person with whom she was speaking, which R.L. testified was the phone number Todd had given her earlier.

Todd's counsel used seven screenshots from the White Castle video during his cross examinations of Anastasio and R.L. During his cross examination of Anastasio, Todd's counsel showed Anastasio the screenshots from the video that appear to show Jackson running the deal. He asked Anastasio if the person in the screenshots was Jackson, and Anastasio ambiguously replied that it was.[1] Anastasio also testified that he did not know the identities of the people shown in the video until trial. That is, he did not know until trial that the people shown in the video were government witnesses Jackson and McAtee. On redirect examination, Anastasio testified that Jackson was probably a runner for the DTO, and that nothing about the White Castle video was inconsistent with the government's view that Todd was overseeing the May 20 drug sale.

Todd's counsel also used those same screenshots in his cross examination of R.L. He showed her the images and then described what they portrayed. R.L. admitted that she had never heard of Jackson or McAtee until that day and had never seen their pictures. She also admitted that the screenshots did not show Eric Todd, and she said that this made her doubt whether she was, in fact, talking to Todd during the May 20 deal.

Based on the lack of physical evidence tying Todd to the drug sale, the defense moved for a judgment of acquittal following its case in chief, which the district court denied. Defense counsel also moved for a mistrial under *Brady v. Maryland*, 373 U.S. 83 (1963), in light of the

---

[1] At first, Anastasio unambiguously stated that the person in the video was Jackson. (Trial Tr., R. 100, Pg. ID 773 (Anastasio Test.).) However, a bit later he stated, "If that is—I don't know if that's Antonio Jackson or not. I mean, you're telling me that's Antonio Jackson. Somebody else told me that's Antonio Jackson. If that is Antonio Jackson, that is the same Antonio Jackson that testified here. Yes, sir." (*Id.*)

prosecution's failure to timely disclose the White Castle video, a motion which the district court also denied. Todd now challenges the district court's *Brady* ruling on appeal.

### B. Todd's Federal Rule of Evidence 404(b) Claim

At an earlier point in the trial, the government called witness S.C., a person who had known Todd for several years and referred to him as "like family." (Trial Tr., R. 99, Pg. ID 595 (S.C. Test.).) The prosecution sought to use S.C.'s testimony to establish that Todd had sold drugs to her brother, Steven, during the conspiracy. However, S.C. consistently denied that she remembered saying anything about Todd to ATF agents in a prior interview. When the prosecution attempted to refresh her recollection, the following exchange occurred:

Q. Do you remember saying that [Steven] was supplied with heroin by Eric Todd from the summer of 2014 until December of 2015, that Todd only supplied heroin to [Steven] and would drop off approximately three to four ounces of heroin every other week, that Todd would then front the heroin to [Steven]. Do you know what that means "front"?

A. Uh-huh.

Q. Okay. What does it mean?

A. Credit.

Q. Right. That he would give heroin to [Steven] and [Steven] would later pay him back; is that correct?

A. No. Because I don't recall him even—I don't recall Steven, like, really messing with him. Steven messed with other people, so—and they locked up on our vaca[tion], so I don't know.

Q. You said that Todd served time in federal prison and that he would usually have a gun with him and that you had observed that. Does any of that refresh your memory?

A. No. Because I didn't hang out with him on the streets.

(*Id.* at 600–01.)

Todd's counsel objected to the question regarding Todd's prior prison sentence and use of a firearm as soliciting inadmissible evidence of prior bad acts under Federal Rule of Evidence

404(b). The district court overruled the objection because S.C. had not responded affirmatively. The court stated, "I mean, if she had confirmed it we would definitely remedy that, but I'm not sure there's something to remedy here if she didn't respond in the affirmative." (*Id.* at 604–05.) Later, the parties revisited the issue and the district court again found that the questioning and S.C.'s testimony "was more of an identification thing—in that particular instance that you were trying to refresh her recollection" and that "she denied it . . . all and it was kind of gone with that." (Trial Tr., R. 100, Pg. ID 648.) But the district court stated that it certainly did not want any evidence regarding Todd's prior prison sentence to come in again, saying "[t]here's been no notice of it and I think it would be unduly prejudicial." (*Id.*) Todd now appeals the district court's evidentiary ruling with regard to S.C.'s cross examination.

## C. Todd's Sentence

Todd's Presentence Report (PSR) assigned an overall offense level of 32 and a criminal history category of V. The resulting guidelines range was 188 months to 235 months' imprisonment with a statutory mandatory minimum of ten years' imprisonment. In calculating Todd's criminal history score, the PSR assigned him two criminal history points for two misdemeanor possession of marijuana convictions respectively that each occurred in 2007 as a result of traffic stops. The first stop occurred because Todd was supposedly driving carelessly. The second stop occurred because Todd turned without using a turn signal and his license plate was not illuminated.

In his sentencing memorandum, Todd recognized that his criminal history score was technically correct but he urged the court to consider the racial disparity in enforcement that causes African American people to be prosecuted for possessing small amounts of marijuana at a much

higher rate than white people. Todd included a newspaper article from August 2019 that describes a Jefferson County Attorney's Office announcement that it would no longer prosecute misdemeanor possession of marijuana charges arising from traffic stops given the racial disparity in policing. The article stated that an investigation revealed that, in 2017, the Louisville Metropolitan Police charged Black drivers with marijuana possession at six times the rate of white people, despite national studies showing that both groups use marijuana at approximately the same rate.

At sentencing, Todd's counsel raised this objection and asked the Court to consider the racial disparity in its consideration of the 18 U.S.C. § 3553(a) factors, essentially arguing that Todd's criminal history score would likely be lower if he was white. He asked for a downward variance to the mandatory minimum sentence of 120 months' imprisonment. The district court did not explicitly take into account Todd's equal protection argument in its analysis of the § 3553(a) factors. It imposed a within-guidelines sentence of 188 months' imprisonment (i.e., fifteen years) followed by five years of supervised release. Todd now challenges that sentence on appeal as a violation of his right to equal protection under the Fourteenth Amendment.

## DISCUSSION

### A. Todd's *Brady* Claim

In *Brady v. Maryland*, the Supreme Court held that a defendant's right to due process is violated when the prosecution suppresses material evidence that would be favorable to the defendant in a criminal case. 373 U.S. at 87. When a defendant raises a *Brady* challenge in the district court, as here, we apply de novo review to the district court's *Brady* determination. *United States v. Crayton*, 357 F.3d 560, 568–69 (6th Cir. 2004). The elements of a *Brady* violation are:

(1) the government suppressed evidence, (2) the suppressed evidence is favorable to the defendant, and (3) the evidence is material (i.e., the defendant was prejudiced as a result of the suppression). *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999); *O'Hara v. Brigano*, 499 F.3d 492, 502 (6th Cir. 2007). This case revolves around the materiality prong.

"[E]vidence is 'material' within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cone v. Bell*, 556 U.S. 449, 469–70 (2009). "A 'reasonable probability' of a different result is . . . shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985)).

When determining whether evidence is material under *Brady*, we must keep in mind three admonishments from the Supreme Court. First, *Brady* materiality is not a "more likely than not" test. *See Kyles*, 514 U.S. at 434 ("The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."); *accord Wearry v. Cain*, 136 S. Ct. 1002, 1006 (2016). Second, *Brady* materiality is not a sufficiency of the evidence test. *See Kyles*, 514 U.S. at 434–35 ("A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict."). And third, once we discover a *Brady* violation, there is no need for us to perform harmless error review. *See id.* at 435 ("[W]e note that, contrary to the assumption made by the Court of Appeals, once a reviewing court applying *Bagley* has found constitutional error there is no need for further harmless-error review." (citation omitted)). The "prejudice" that results from a

10

*Brady* violation is the denial of a person's due process right to a fair trial, meaning one that results in a verdict worthy of confidence. *Id.* at 434–35.

The typical *Brady* case contemplates that the prosecution completely failed to disclose favorable evidence to the defendant. *See, e.g.*, *Cone*, 556 U.S. at 451; *Kyles*, 514 U.S. at 422. But we have also recognized that even belated disclosure of *Brady* material before or during trial can deprive of a defendant of his due process rights. *See Joseph v. Coyle*, 469 F.3d 441, 472 (6th Cir. 2006); *see also United States v. Farley*, 2 F.3d 645, 654 (6th Cir. 1993) (stating that "due process requires only that disclosure of exculpatory material be made in sufficient time to permit the defendant to make effective use of that material at trial"). In such circumstances, the defendant faces a higher hurdle than in a failure to disclose case, however, because we consider the effect of the delay "as part of the collective materiality inquiry." *Joseph*, 469 F.3d at 472. Accordingly, a defendant in a belated disclosure case must show that the "delay itself cause[d] prejudice," in addition to showing that the evidence was otherwise material to his innocence or guilt. *O'Hara*, 499 F.3d at 503 (quoting *United States v. Bencs*, 28 F.3d 555, 561 (6th Cir. 1994)).

Todd's *Brady* claim fails under this standard. While Todd has a fairly compelling argument that the White Castle video was pertinent to his innocence or guilt, given that it was a video of the very transaction for which the government was prosecuting him, Todd has failed to show that the "delay itself cause[d] prejudice." *Id.* This is because Todd was able to use the video at trial. In fact, he used seven screenshots from the video in his cross examinations of the government's two key witnesses, R.L. and Agent Anastasio. Both of these witnesses testified that Todd was not present in the video, and Agent Anastasio testified that the person in video was Jackson. The screenshots

11

simply failed to convince the jury that Todd was not overseeing the May 20 deal, notwithstanding the fact that he is not shown in the White Castle video.

We are not in a position to second guess that judgment, especially where the video is not necessarily inconsistent with the government's trial theory. As the government points out, this was a sophisticated DTO and it is possible that Jackson's uncle was giving instructions to Jackson and McAtee while Todd was giving instructions to R.L. Stated differently, Jackson's uncle may have been focused on supplying the drugs while Todd was focused on coordinating with the buyer. And given that this was a sophisticated drug deal, it may have been beneficial to keep certain members of the transaction in the dark about who else was involved. Jackson even testified at trial that he did not know every member of the DTO and that his uncle "only allowed me to know what he wanted me to know." (Trial Tr., R. 99, Pg. ID 609 (Jackson Test.).)

Todd responds that he was prejudiced by the delayed disclosure because, if the video had been timely disclosed, he "would have had time to discover the identity and significance of Antonio Jackson and other individuals much earlier than he did." (Appellant's Br. at 13.) Thus, in Todd's view, he could have "potentially interview[ed] Jackson and others about their presence and activity in the video, and their knowledge of the transaction," and could have sought Jackson's phone records "to find out who [Jackson] was talking to and potentially prove that he was talking to the confidential informant." (*Id.*) But if Todd wanted more time to investigate with regard to Jackson, he could have asked for a continuance. *See, e.g.*, *Joseph*, 469 F.3d at 472 (declining to find prejudice in part because "if the defense needed more time, it could have asked for a continuance"); *United States v. Holloway*, 740 F.2d 1373, 1381 (6th Cir. 1984) (similar).

To be sure, Todd's counsel moved for a mistrial on *Brady* grounds in the district court. But he only did so *after* the trial had occurred, notwithstanding that Todd's counsel received the video at least three days prior to trial. Because Todd had ample time to review the video before trial to determine if a *Brady* violation had occurred, we must infer from his decision to proceed to trial without objection that he believed he had enough time to make use of the evidence. *See, e.g.*, *United States v. Hicks*, 495 F. App'x 633, 640 (6th Cir. 2012) ("Defense counsel's failure to request a continuance indicates that he had adequate time to prepare a defense."); *Crayton*, 357 F.3d at 569 ("Any disadvantage that a defendant might suffer because of the tardiness of [*Brady*] material can be cured by asking for a recess."). This comports with our interests in judicial economy and fairness because it prevents a defendant from choosing to withhold objection to a constitutional violation that occurs at trial and then seeking to raise that objection afterwards, depending on how the trial goes. *See Wainwright v. Sykes*, 433 U.S. 72, 88–90 (1977) (discussing, in the habeas context, the many purposes of the contemporaneous objection rule, including to prevent defense lawyers from "sandbagging").

Moreover, defense counsel had time to review the video by the time that Jackson and McAtee (the two people shown in the video) testified on day two of the trial. And yet, Todd's counsel chose not to question Jackson or McAtee about the video or to enter the screenshots of the video into evidence during their cross examinations. If Todd wanted to know who Jackson was on the phone with, (*see* Appellant's Br. at 7), his counsel had the opportunity to ask him during cross examination. And even if defense counsel did not realize the relevance of such a question at the time that Jackson testified, he could have asked to recall Jackson or McAtee after he had entered the video screenshots into evidence on day three. *See, e.g.*, *United States v. Davis*, 306 F.3d 398,

13

421 (6th Cir. 2002) (holding that a defendant failed to show prejudice in part because the defendant chose not to recall a witness who could have testified about the *Brady* evidence); *United States v. Spry*, 238 F. App'x 142, 149 (6th Cir. 2007) (same). Under such circumstances, Todd cannot show that "the delay itself cause[d] prejudice." *O'Hara*, 499 F.3d at 503.

We should note, however, that our decision should not be taken to condone the government's conduct here. The White Castle video was clearly relevant to Todd's charge, and we can see no good reason why the government failed to disclose it either in its initial discovery or afterwards. In short, it was inexcusable for the government to wait until four days before trial to disclose key evidence pertaining to the charge against the Defendant. However, the government did ultimately disclose the video prior to trial, and defense counsel was able to effectively use screenshots from the video when cross examining the government's two primary witnesses. Defense counsel's use of the video at trial, coupled with the fact that defense counsel failed to ask for a continuance before or during trial or to recall witnesses even after reviewing the video, causes us to affirm.

### B. Todd's Federal Rule of Evidence 404(b) Claim

Todd next argues that the prosecution's questioning of witness S.C. violated Federal Rule of Evidence 404(b). Rule 404(b) provides that, except for some permitted uses, evidence of a prior bad act is generally not admissible to prove a person's character in order to suggest that the person acted in accordance with that character on a particular occasion. Fed. R. Evid. 404(b); *accord United States v. Mandoka*, 869 F.3d 448, 456 (6th Cir. 2017). If the government seeks to use Rule 404(b) evidence for one of the permitted uses, then it must "provide reasonable notice of the

general nature of any such evidence that the prosecutor intends to offer at trial." Fed. R. Evid. 404(b)(2)(A).

We review a district court's evidentiary ruling for an abuse of discretion. *Mandoka*, 869 F.3d at 457. More specifically, when reviewing a district court's Rule 404(b) determination, we apply a tripartite framework: we review "(i) the factual question of whether the prior bad acts occurred; (ii) the legal question of whether the evidence was offered for an admissible purpose; (iii) and the discretionary question of whether the district court permissibly applied the Rule 403 balancing test." *Id.* Under this framework, "reversal is only proper if the district court committed a legal error by admitting the prior acts evidence for an impermissible purpose, relied on clearly erroneous facts in finding that the prior acts occurred, or abused its discretion in weighing the evidence's probative and prejudicial value under Rule 403's balancing test." *Id.*

Todd's Rule 404(b) challenge fails because the district court did not admit any evidence of Todd's prior bad acts. Instead, the prosecutor asked S.C. about a statement that she supposedly made to an ATF agent before trial (a statement that related to Todd's prior incarceration) in an effort to refresh her recollection. S.C. did not reply, and the prosecutor's question was not evidence. Because the question remained unanswered, no evidence of prior bad acts was admitted. *See United States v. Miller*, 562 F. App'x 272, 303 (6th Cir. 2014) ("[N]o actual violation of the rules of evidence occurred here, as a lawyer's unanswered question is not evidence.").

That said, we must once again condemn the prosecutor's conduct here. The reference to Todd's prior incarceration—even if made as a fleeting remark in an effort refresh a witness' memory—strikes us as inappropriate. However, Todd does not assert a prosecutorial misconduct claim on appeal or otherwise argue that the prosecutor's question presented constitutional

problems.[2] *See, e.g.*, *Greer v. Miller*, 483 U.S. 756, 765 (1987) (recognizing that a prosecutor's unanswered question made in the presence of the jury can amount to prosecutorial misconduct when it "so infec[ts] the trial with unfairness as to make the resulting conviction a denial of due process"). *But see United States v. Griffin*, 437 F.3d 767, 769 (8th Cir. 2006) (declining to find prosecutorial misconduct in part because "the questions went unanswered" and "the court promptly instructed the jury to disregard the questions"); *United States v. Johnson*, 302 F.3d 139, 151 (3d Cir. 2002) (similar). Because Todd brings his claim as an evidentiary challenge only, and no evidence of Todd's alleged prior bad acts was ever admitted, we affirm.

## C. Todd's Sentence

In his final claim, Todd appeals his within-guidelines sentence of 188 months' imprisonment. Todd argues that his sentence violates his Fourteenth Amendment right to equal protection because his criminal history score reflected two possession of marijuana convictions that allegedly would not have occurred but for the fact that Todd is African American. We review constitutional challenges to a sentence de novo. *United States v. Jones*, 569 F.3d 569, 573 (6th Cir. 2009). The government wrongly argues that we should review Todd's sentence only for plain error because, according to the government, Todd did not preserve his equal protection argument in response to the district court's *Bostic* question. *See United States v. Bostic*, 371 F.3d 865 (6th Cir. 2004). This is incorrect.

---

[2] Todd's first and only mention of prosecutorial misconduct occurred in his reply brief when he was attempting to distinguish this case from the government's reliance on *United States v. Miller*, 562 F. App'x at 302. This is insufficient to preserve a prosecutorial misconduct claim for our review. *See Island Creek Coal Co. v. Wilkerson*, 910 F.3d 254, 256 (6th Cir. 2018) ("Time, time, and time again, we have reminded litigants that we will treat an 'argument' as 'forfeited when it was not raised in the opening brief.'" (citation omitted)). Todd's opening brief clearly raised this issue as an evidentiary challenge under Rule 404(b) only. Therefore, any prosecutorial misconduct claim is forfeited.

In *Bostic*, this Court announced "a new procedural rule, requiring district courts, after pronouncing the defendant's sentence but before adjourning the sentencing hearing, to ask the parties whether they have any objections to the sentence just pronounced *that have not previously been raised*." *Id.* at 872 (emphasis added). The purpose of the *Bostic* question is to "ensure[] that parties may object to the court's reasoning or failure to address a particular argument" and "afford[] the district court an opportunity to correct errors right away," thereby facilitating appellate review. *United States v. Simmons*, 587 F.3d 348, 354 (6th Cir. 2009) (citing *Bostic*, 371 F.3d at 873). However, we do not require parties to reiterate arguments that they have already made in response to the *Bostic* question in order to preserve them for appellate review. *See, e.g.*, *id.* at 355 ("[I]t is unnecessary for a party to repeat previously made objections in order to secure [a] lower standard of review on appeal."); *United States v. Kamper*, 748 F.3d 728, 740 (6th Cir. 2014) ("No explicit objection after the *Bostic* inquiry was required here because Kamper had already argued and the district court had explicitly addressed the issue.").

In the present case, Todd presented his equal protection argument for a downward variance both in his sentencing memorandum and at the sentencing hearing. The district court rejected Todd's argument and imposed a within-guidelines sentence. In response to the *Bostic* question, defense counsel responded, "Nothing than other—other than previously noted, Your Honor." (Sent. Hr'g Tr., R. 96, Pg. ID 406.) Because Todd had already presented the issue he now raises, there was no need for an additional *Bostic* objection. *Simmons*, 587 F.3d at 355; *Kamper*, 748 F.3d at 740.

Todd's constitutional argument is that his criminal history score (and therefore his guidelines range) would have been lower if he was white, rather than African American, because

17

he would not have been convicted for his misdemeanor possession of marijuana offenses. Todd supports this argument with a newspaper article and statements from the Jefferson County Attorney's Office that allegedly show a racial disparity in policing.

In other contexts, the Supreme Court "has permitted consideration of race to offset negative effects of past discrimination and to combat harmful stereotypes." *United States v. Grisanti*, 943 F.3d 1044, 1053 (7th Cir. 2019) (citing *Grutter v. Bollinger*, 539 U.S. 306, 328–30 (2003) (upholding a public law school's affirmative action program)). However, the Sentencing Guidelines explicitly provide that race should not be considered in the determination of a sentence. *See* U.S.S.G. § 5H1.10. Nevertheless, the Sentencing Guidelines do not overcome constitutional requirements.

We rejected a race-based mitigation argument similar to Todd's in *United States v. Givhan*, 740 F. App'x 458 (6th Cir. 2018), in accordance with § 5H1.10. In *Givhan*, the defendant argued that he should receive a reduced sentence based on "racial disparities in the prosecution of sex trafficking violations." *Id.* at 466. We held that that where the defendant "does not argue that the district court improperly *considered* his race when imposing his sentence [but] argues instead that the district court improperly *failed* to consider his race during sentencing—something it is not permitted to do," there was no constitutional error. *Id.* at 467. The same is true here under currently applicable case law and the factual circumstances presented by this case.

## CONCLUSION

For the reasons given above, we **AFFIRM** Todd's conviction and sentence.